DONAL A. CARTY AND SARA ANN CARTY, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 79265–79285. Filed April 16, 1962.

*Austin H. Peck, Jr., Esq.*, for the petitioners.
*Walter S. Weiss, Esq.*, and *Allan I. Blau, Esq.*, for the respondent.

WITHEY, *Judge:* Respondent has determined deficiencies in the income tax of petitioners and an addition to tax for the years and in the amounts as follows:

[1] Proceedings of the following petitioners are consolidated herewith: Agnes Morning Carty, Docket No. 79266; Estate of Henry J. Carty, Deceased, Mary Louise Carty, Executrix, Mary Louise Carty, Surviving Wife, Docket No. 79267; James Marzullo and Esther Marzullo, Docket No. 79268; W. J. Thiessen, Docket No. 79269; Market Basket, Docket No. 79270; Alexander's Markets, formerly S. H. Alexander and Son, Docket No. 79271; Thriftimart, Inc. (formerly Fitzsimmons Stores, Ltd.), Docket No. 79272; Charles Kennard Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79273; Theodore Albert Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79274; Wilfred Luer Von der Ahe Trust, T. A. Von de Ahe, Trustee, Docket No. 79275; Mary Linda Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79276; Vincent Michael Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79277; Thomas Richard Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79278; Walter Bruno Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79279; Gretchen Ellen Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79280; Frederick Theodore Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79281; Christina Elizabeth Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79282; Henry Lieb Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79283; Marie Therese Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79284; and Virginia Marie Von der Ahe Trust, T. A. Von der Ahe, Trustee, Docket No. 79285.

| Petitioner | Docket No. | Year | Deficiency | Addition to tax, I.R.C. 1939, sec. 294(d)(2) |
|---|---|---|---|---|
| Donal A. Carty and Sara Ann Carty | 79265 | 1952 | [1] $1,205.58 | |
| | | 1953 | 197.54 | |
| | | 1954 | 203.22 | |
| Agnes Morning Carty | 79266 | 1952 | [1] 1,255.83 | |
| | | 1953 | 229.43 | |
| | | 1954 | 278.81 | |
| Estate of Henry J. Carty, Deceased, Mary Louise Carty, Executrix, and Mary Louise Carty | 79267 | 1952 | [1] 2,515.48 | |
| | | 1953 | 458.86 | |
| | | 1954 | 585.98 | |
| James Marzullo and Esther Marzullo | 79268 | 1952 | [1] 14,712.91 | |
| | | 1953 | 2,757.90 | |
| | | 1954 | 26,389.54 | |
| | | 1955 | 13,969.06 | |
| W. J. Thiessen | 79269 | 1952 | [1] 14,235.50 | $676.90 |
| | | 1953 | 2,887.92 | |
| | | 1954 | 21,698.78 | |
| | | 1955 | 15,341.65 | |
| Market Basket | 79270 | 1952 | [1] 30,398.92 | |
| | | 1953 | 3,813.09 | |
| | | 1/1/54–1/1/55 | 5,324.88 | |
| | | 1/2/55–12/31/55 | 5,973.12 | |
| Alexander's Markets, Inc. | 79271 | FYE 6/30/52 | [1] 11,239.38 | |
| | | FYE 6/30/53 | 2,819.85 | |
| | | FYE 6/30/54 | 30,654.78 | |
| | | FYE 6/30/55 | 18,737.13 | |
| Thriftimart, Inc. | 79272 | FYE 3/13/53 | 5,432.65 | |
| | | FYE 3/31/54 | 5,957.66 | |
| | | FYE 3/26/55 | 7,475.66 | |
| Charles Kennard Von der Ahe Trust | 79273 | 1952 | [1] 2,625.86 | |
| | | 1953 | 412.96 | |
| | | 1954 | 411.20 | |
| | | 1955 | 544.51 | |
| Theodore Albert Von der Ahe Trust | 79274 | 1952 | [1] 1,147.63 | |
| | | 1953 | 131.88 | |
| | | 1954 | 132.57 | |
| | | 1955 | 207.40 | |
| Wilfred Luer Von der Ahe Trust | 79275 | 1952 | [1] 2,625.86 | |
| | | 1953 | 412.96 | |
| | | 1954 | 411.20 | |
| | | 1955 | 544.51 | |
| Mary Linda Von der Ahe Trust | 79276 | 1952 | [1] 2,625.86 | |
| | | 1953 | 412.96 | |
| | | 1954 | 411.20 | |
| | | 1955 | 544.51 | |
| Vincent Michael Von der Ahe Trust | 79277 | 1952 | [1] 1,147.63 | |
| | | 1953 | 131.88 | |
| | | 1954 | 132.57 | |
| | | 1955 | 207.40 | |
| Thomas Richard Von der Ahe Trust | 79278 | 1952 | [1] 2,625.86 | |
| | | 1953 | 412.96 | |
| | | 1954 | 411.20 | |
| | | 1955 | 544.51 | |
| Walter Bruno Von der Ahe Trust | 79279 | 1952 | [1] 1,147.63 | |
| | | 1953 | 131.88 | |
| | | 1954 | 132.57 | |
| | | 1955 | 207.40 | |
| Gretchen Ellen Von der Ahe Trust | 79280 | 1952 | [1] 2,625.86 | |
| | | 1953 | 412.96 | |
| | | 1954 | 411.20 | |
| | | 1955 | 544.51 | |
| Frederick Theodore Von der Ahe Trust | 79281 | 1952 | [1] 2,625.86 | |
| | | 1953 | 412.96 | |
| | | 1954 | 411.20 | |
| | | 1955 | 544.51 | |
| Christina Elizabeth Von der Ahe Trust | 79282 | 1952 | [1] 1,147.63 | |
| | | 1953 | 131.88 | |
| | | 1954 | 132.57 | |
| | | 1955 | 207.40 | |
| Henry Lieb Von der Ahe Trust | 79283 | 1952 | [1] 2,625.86 | |
| | | 1953 | 412.96 | |
| | | 1954 | 411.20 | |
| | | 1955 | 544.51 | |
| Marie Therese Von der Ahe Trust | 79284 | 1952 | [1] 2,625.86 | |
| | | 1953 | 412.96 | |
| | | 1954 | 411.20 | |
| | | 1955 | 544.51 | |
| Virginia Marie Von der Ahe Trust | 79285 | 1952 | [1] 2,625.87 | |
| | | 1953 | 412.96 | |
| | | 1954 | 411.20 | |
| | | 1955 | 544.51 | |

[1] Reflects increased deficiency claimed in Amendment to Answer.

Petitioner Market Basket, Docket No. 79270, claims an overpayment for the taxable year 1953 in the amount of $2,999.39.

The issues presented for our decision are the correctness of the respondent's action in determining (1) that upon the liquidation of Jerseymaid Milk Products Co., Inc., on January 12, 1952, and the distribution of all of its assets to petitioners, goodwill in the amount of $537,500 was included among the assets so distributed; (2) that the fair market value of automotive equipment acquired by petitioners from Jerseymaid Milk Products Co., Inc., by way of liquidation on January 12, 1952, was $326,000; and (3) that petitioner W. J. Thiessen is liable for an addition to tax under section 294(d) (2) of the Internal Revenue Code of 1939 for substantial underestimation of estimated tax for 1952.[2]

Additional issues presented by the pleadings have been settled by concession of the parties.

### GENERAL FINDINGS OF FACT.

Such of the facts as have been stipulated are found accordingly.

All of the income tax returns for all petitioners for all years here involved were filed with the district director of internal revenue at Los Angeles, California.

Petitioners were stockholders in Jerseymaid Milk Products Co., Inc., a corporation engaged in owning and operating a wholesale milk-processing and -distribution business until its liquidation in 1952.

### Issue 1.   Goodwill.

#### FINDINGS OF FACT.

Jerseymaid Milk Products Co., Inc. (sometimes hereinafter referred to as Jerseymaid or the corporation), was a corporation organized under the laws of the State of California on July 24, 1947. It was formed for the purpose of engaging in the business of owning and operating a wholesale milk-processing and -distribution business. Jerseymaid on August 1, 1947, acquired all of the assets, subject to certain liabilities, of a predecessor partnership, Jerseymaid Milk

---

[2] The parties have agreed on stipulation that the addition to tax for substantial underestimation of estimated tax determined by respondent against petitioner W. J. Thiessen for 1952 under section 294(d)(2) of the 1939 Code is in issue here "to the extent that it is affected by the adjustments in controversy in these proceedings." We thereby understand the parties to have stipulated that the correctness of the respondent's action in determining the liability of petitioner for this addition to tax depends entirely upon our disposition of Issues 1 and 2. Proper adjustment accordingly will be made for this item under Rule 50.

Products Co., which previously had been engaged in the same business. Jerseymaid began operations at the time of acquisition of these assets.

The partners in the Jerseymaid Milk Products Co., the predecessor partnership, on August 1, 1947, were W. J. Thiessen, James Marzullo, T. A. Von der Ahe,[3] Alexander's Markets, Inc.,[4] Carty Bros.,[5] Mayfair Companies,[6] Roberts Public Markets, Inc.,[7] and Fitzsimmons Stores, Ltd. As consideration for the assets of the partnership, Jerseymaid issued 300,000 shares of common stock at a par value of $1 per share to the transferors on August 1, 1947. The original issuance of shares of Jerseymaid on August 1, 1947, the issuance of additional shares in 1948, the transfers of shares which occurred throughout the existence of the corporation, and the prices per share for each transaction were as follows:

| Shareholder | Original issue | Transfer 3/8/48 | Transfer 5/23/48 | New issue[1] 7/19/48 | Redemption 10/7/48 | Transfer 9/14/50 |
|---|---|---|---|---|---|---|
| W. J. Thiessen | 33,990 | | | 6,010 | | (3,500) |
| James Marzullo | 33,990 | | | 6,010 | | (3,500) |
| T. A. Von der Ahe, Trustee | 57,810 | | | 6,190 | | |
| S. H. Alexander | 23,820 | | (1,645) | | | |
| Henry Carty | 37,410 | | (2,585) | | | |
| Fitzsimmons Stores, Ltd | 33,990 | | | 30,010 | | |
| Market Basket | | [1]33,990 | | 21,010 | | [2]7,000 |
| Edwin J. Fox (Mayfair) | 33,990 | (33,990) | | | | |
| Roberts Public Markets, Inc | 45,000 | | | | | |
| Shopping Bag | | | [1]4,230 | | [1](4,230) | |
| Shares outstanding: | | | | | | |
| Net change | 300,000 | | | 69,230 | (4,230) | |
| Total | 300,000 | 300,000 | 300,000 | 369,230 | 365,000 | 365,000 |

See footnotes at end of table.

[3] T. A. Von der Ahe at all times here material was either vice president or president of Von's Grocery Co., the owner and operator of a chain of supermarkets in the metropolitan Los Angeles area. The Jerseymaid stock held by him was held as trustee for several trusts (which also owned stock in Von's Grocery Co.) which are petitioners herein: Charles Kennard Von der Ahe Trust, Theodore Albert Von der Ahe Trust, Wilfred Luer Von der Ahe Trust, Mary Linda Von der Ahe Trust, Vincent Michael Von der Ahe Trust, Thomas Richard Von der Ahe Trust, Walter Bruno Von der Ahe Trust, Gretchen Ellen Von der Ahe Trust, Frederick Theodore Von der Ahe Trust, Christina Elizabeth Von der Ahe Trust, Henry Lieb Von der Ahe Trust, Marie Therese Von der Ahe Trust, and Virginia Marie Von der Ahe Trust, Docket Nos. 79273–79285, respectively.

[4] The shares owned by Alexander's Markets, Inc., the owner and operator of a chain of supermarkets in the Los Angeles area, were held in the name of S. H. Alexander, one of the principal officers therein.

[5] The shares owned by Carty Bros., a partnership owning and operating a chain of supermarkets, were held in the name of Henry Carty, one of the partners.

[6] The stock owned by Mayfair Companies, the owner and operator of a chain of supermarkets in the Los Angeles area, was held in the name of Edwin J. Fox. During 1948 Market Basket, a corporation which was the owner and operator of another chain of supermarkets, purchased the Jerseymaid stock owned by Mayfair Companies.

[7] Roberts Public Markets, Inc., a corporation, was the owner and operator of a chain of supermarkets in the Los Angeles area. In 1951, all of the stock of Roberts Public Markets was acquired by Fitzsimmons Stores, Ltd., which also was the owner and operator of a chain of supermarkets. Thereafter, Roberts Public Markets, Inc., was dissolved and its assets were distributed to Fitzsimmons Stores, Ltd., which later changed its name to Thriftimart, Inc.

| Shareholder | Transfer 9/25/50 | Transfer 6/19/51 | Transfer 9/24/51 | Ownership 1/12/52 | Percent owned |
|---|---|---|---|---|---|
| W. J. Thiessen | | | | 36,500 | 10.00 |
| James Marzullo | | | | 36,500 | 10.00 |
| T. A. Von der Ahe, Trustee | ² 9,000 | | ⁴ 5,000 | 78,000 | 21.37 |
| S. H. Alexander | | | (1,000) | 21,175 | 5.80 |
| Henry Carty | (20,000) | | (2,000) | 12,825 | 3.51 |
| Fitzsimmons Stores, Ltd | | ³ 45,000 | (4,000) | 105,000 | 28.77 |
| Market Basket | ¹ 11,000 | | ⁴ 2,000 | 75,000 | 20.55 |
| Edwin J. Fox (Mayfair) | | | | | |
| Roberts Public Markets, Inc | | (45,000) | | | |
| Shopping Bag | | | | | |
| Shares outstanding: | | | | | |
| Net change | | | | | |
| Total | 365,000 | 365,000 | 365,000 | 365,000 | 100.00 |

¹ $1.30 per share.
² $2.13 per share.
³ Dissolution of Roberts Public Markets, Inc.
⁴ $1.825 per share.

The net book value of the assets acquired by Jerseymaid on August 1, 1947, was $300,000.

The opening balance sheet of the corporation as of August 1, 1947, was as follows:

JERSEYMAID MILK PRODUCTS CO., INC.
BALANCE SHEET

| | Assets Aug. 1, 1947 |
|---|---|
| Current assets: | |
| Cash on hand and in banks | $45,582.46 |
| Accounts receivable, trade | 91,213.61 |
| Less reserve for bad debts | 1,356.60 |
| Accounts receivable, net | 89,857.01 |
| Inventories: | |
| Dairy products | 124,859.67 |
| Frozen food | |
| Dairy supplies | 64,802.26 |
| Hay and grain (subject to chattel mortgage) | 24,912.94 |
| Total current assets | 350,014.34 |
| Fixed assets: | |
| Buildings and improvements | 53,796.69 |
| Machinery and equipment | 148,315.42 |
| Automotive equipment | 138,344.31 |
| Office furniture and equipment | 7,366.26 |
| Milk cans and cases | 14,206.51 |
| Machinery and equipment, Camarillo | 25,700.53 |
| Leasehold improvements, Camarillo | 9,674.28 |
| Total | 397,404.00 |
| Less reserves for depreciation | 172,263.39 |
| Net depreciable assets | 225,140.61 |
| Land at Los Angeles | 41,043.56 |
| Total fixed assets | 266,184.17 |

Dairy cattle at Camarillo:
Subject to chattel mortgage_____ $89,032.22

Prepaid items and deferred charges:
Unexpired insurance_____ 2,797.09
Prepaid taxes and licenses_____ 2,690.73
Prepaid rent_____ 2,959.97
Deposits returnable_____ 37.50

Total prepaid items, etc._____ 8,485.29

Other assets:
Growing crop at Camarillo_____ 11,555.00
Construction in progress_____ _____
Loan receivable_____ _____
Goodwill _____ 1.00

Total other assets_____ 11,556.00

Total _____ 725,272.02

LIABILITIES, CAPITAL STOCK, AND SURPLUS

Current liabilities:                                        *Aug. 1, 1947*
Note payable to bank, secured by chattel mortgage_____ $255,000.00
Other notes payable to bank, unsecured_____ _____
Accounts payable, trade_____ 50,972.83
Accounts payable for products_____ 83,672.79
Draft liability at Blackfoot_____ 17,537.34
Federal and State taxes payable_____ 5,666.50
Federal income taxes payable_____ _____
Accrued interest payable_____ 764.67
Other accrued liabilities_____ 11,657.89

Total current liabilities_____ 425,272.02

Capital stock and surplus:
Capital stock, authorized 500,000 shares common stock, par value
$1.00 per share, issued and outstanding, $300,000 shares earned
surplus _____ 300,000.00

Total capital stock and surplus_____ 300,000.00
Contingent liability as endorser on various
notes of milk shippers, $159,258.77

Total_____ $725,272.02

The changes in the shareholdings of Jerseymaid Milk Products Co., Inc., which occurred on September 14, 1950, September 25, 1950, and September 24, 1951, were made in order that the percentages of shares owned by the purchasers of its products would be substantially the same as the relative percentages of total purchases of all products from Jerseymaid.

Petitioner W. J. Thiessen was one of the founders and managing partners of Jerseymaid Milk Products Co. in 1935 and continued in that capacity until 1947. In 1947 he became president of the corporation. He devoted all of his time to the management of Jerseymaid.

Petitioner James Marzullo, another of the founders of the Jerseymaid milk-processing business, was also a managing partner until 1947 when he became secretary-treasurer of the corporation, devoting his full time to its management.

The remaining stockholders of Jerseymaid, T. A. Von der Ahe, S. A. Alexander, Henry Carty, Edwin J. Fox, Roberts Public Markets, Inc., and Fitzsimmons Stores, Ltd., were owners of chains of retail grocery stores in the metropolitan Los Angeles area.

The total sales of the corporation for the 5 months ended December 31, 1947, and the years 1948, 1949, 1950, and 1951 were as follows:

| Period | Total sales |
|---|---|
| 8/1/47–12/31/47 | $1,824,056.19 |
| 1948 | 7,512,282.14 |
| 1949 | 9,154,675.32 |
| 1950 | 11,509,552.21 |
| 1951 | 14,588,828.61 |

The percent of the total sales of Jerseymaid Milk Products Co., Inc., to each of its principal customers for the 5 months ended December 31, 1947, and the years 1948, 1949, 1950, and 1951 was as follows:

| Stores | 8/1/47–12/31/47 | 1948 | 1949 | 1950 | 1951 |
|---|---|---|---|---|---|
| | | Percent | | | |
| Alexander's | 4.07 | 4.93 | 6.35 | 6.82 | 5.72 |
| Carty Bros | 5.02 | 5.28 | 4.56 | 3.87 | 3.56 |
| Fitzsimmons | 24.53 | 23.85 | 22.76 | 28.49 | 29.73 |
| Market Basket | 13.02 | 18.12 | 20.70 | 21.91 | 23.99 |
| Mayfair | 5.60 | .52 | | | |
| Roberts | 16.71 | 14.54 | 13.57 | 4.07 | |
| Shopping Bag | 10.03 | 5.29 | | | |
| Von's | 14.14 | 19.44 | 22.70 | 22.61 | 23.40 |
| All others | 6.61 | 6.96 | 9.07 | 12.18 | 13.60 |
| Jobber sales | .04 | .06 | | | |
| Visalia | | | .29 | .05 | |
| Miscellaneous | | .23 | 1.01 | | |
| | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

Throughout its existence and on January 12, 1952, Jerseymaid was a "captive creamery" of the supermarket chains which at all times here material owned more than 77 percent of its outstanding stock. The corporation produced bottled milk but no other milk products. However, it was also engaged in the business of distributing milk and dairy products, butter, ice cream, eggs, and frozen foods. Its bottled milk was produced both from milk obtained from its own dairy herd and also from milk purchased from independent dairymen. The corporation, on January 12, 1952, owned a dairy farm with a herd of 634 cattle located at Camarillo, California. Jerseymaid at

no time engaged in the sale of milk at retail through home-to-home deliveries. On January 12, 1952, the corporation had no customers other than its five owning supermarkets, with the sole exception of Safeway Stores. The patronage of Safeway Stores was limited to frozen foods. With minor exceptions, the owning supermarkets consistently sold Jerseymaid milk and milk products exclusively.

As of January 1952, the chain supermarket stockholders in Jerseymaid and the number of retail outlets operated by them were as follows:

| Name | Number of stores |
|------|------------------|
| Von's Grocery Company | 18 |
| Alexander's Markets, Inc | 5 |
| Carty Bros | 7 |
| Thriftimart, Inc | 62 |
| Market Basket | 28 |
| | 120 |

The principal reason for the practically exclusive use of Jerseymaid products by the five supermarket chains which on January 12, 1952, held 80 percent of its outstanding stock was the extreme efficiency in operation of Jerseymaid and its relatively low operating costs which made possible a higher operating profit than normally could have been obtained by a noncaptive operation. Captive creameries, such as Jerseymaid, effected cost savings primarily by purchasing commodities in large quantities and by delivering in large volume, making possible a rapid turnover in inventory. As a captive operation, it had no need for employing salesmen or for collection personnel to assist in collecting accounts receivable. Jerseymaid utilized the most modern processing equipment. Because of such savings the corporation's per-unit cost of processing and distributing dairy products was sharply reduced in comparison with the per-unit costs normally incurred by a noncaptive operator.

At all times here material the minimum prices at which milk could be sold in the State of California at the producer, wholesale, and retail levels were fixed by administrative regulation. Under California law the State director of agriculture was authorized and required to regulate at every level the sale of milk and milk products and to establish minimum prices "from the cow to the consumer." Cal. Agric. Code, secs. 735(c), 735.4(b), and 736.11. The operating cost level incurred by noncaptive creameries in California normally was utilized by the State director of agriculture in his determination of a "reasonable profit" by a "reasonably efficient" distributor and the consequent establishment of minimum wholesale milk prices. Cf. Cal. Agric. Code, sec. 736.12. Because captive dairies operated generally more efficiently it naturally followed that they were able to realize generally a greater profit than noncaptive dairies. The established noncaptives in the Los Angeles area incurred considerably higher operating costs during 1948 through 1952 than Jerseymaid.

Except for the existence of the milk control laws in the State of California, the five supermarket chains which on January 12, 1952, owned 80 percent of Jerseymaid stock and purchased practically all of its dairy products could have obtained substantial discounts or rebates from their low-cost captive distributor. But the effect of the California milk control laws was to make any such discount, rebate, or gift illegal and consequently to foreclose the possibility for the owning supermarket chains by this method to obtain any direct benefit from the cost savings made possible by the captive operation. Cal. Agric. Code, secs. 730.2 and 736.13.

None of the grocery chain customers of Jerseymaid began to purchase its products until first acquiring Jerseymaid stock, and the purpose of each of these supermarket chains in acquiring an ownership interest in the corporation was to share in the high margin of profit made possible by its captive operation. Mayfair Markets sold its stock in Jerseymaid on March 8, 1948, and the stock owned by Shopping Bag was redeemed by the corporation on October 7, 1948. These companies were customers of Jerseymaid in 1948, but ceased to be thereafter.

Jerseymaid earned net income before taxes and depreciation for the years 1948 through 1951 of $2,152,637.88.

The milk produced and sold by Jerseymaid during the years 1947 through 1952 was of good quality and comparable to that produced by competing creameries in the Los Angeles area. Jerseymaid milk contained 3.6 percent butterfat although the State of California required only 3.5 percent. The corporation was frequently awarded California State Fair awards in recognition of the good quality of its products. All milk produced in the Los Angeles area during 1951 and 1952 was subject to rigid quality controls by the State director of agriculture. The milk and dairy products produced by competing creameries were also of good quality and won numerous awards in recognition thereof.

From January 1, 1948, through January 12, 1952, the corporation expended the following amounts for advertising its products:

ADVERTISING EXPENSE

| | Radio | Billboard | Television | Total |
|---|---|---|---|---|
| Aug. 1, 1947–Dec. 31, 1947 | | | | |
| 1948 | $11,688.83 | $40,666.09 | | $52,354.92 |
| 1949 | 18,765.40 | 21,279.07 | | 40,044.47 |
| 1950 | 33,053.12 | 12,693.88 | | 45,747.00 |
| 1951 | 33,183.50 | 17,549.40 | $12,987.28 | 63,720.18 |
| Jan. 1–12, 1952 | | 1,533.71 | | 1,533.71 |

In addition to the advertising conducted by the corporation itself, its name and products were consistently promoted by the retail outlets belonging to Von's Grocery Co., one of the grocery chains owning

stock therein. The amount of advertising carried on by Jerseymaid was relatively small in comparison with the extensive advertising conducted by noncaptive dairies. As a result of these consistent advertising activities, Jerseymaid products gained wide consumer acceptance throughout the Los Angeles area. Neither the officers of Jerseymaid nor the managers of the supermarket chains believed it necessary to engage in more extensive and more costly advertising endeavors because their experience had established that the customers of the various retail supermarket outlets would continue to purchase the dairy products carried by those supermarkets so long as they proved to be of good quality.

Widespread advertising in the Los Angeles area throughout a period of several years prior to 1952 had created a demand for several other brands of milk and milk products such as Carnation, Arden, Knudsen, and Adohr. Many individual customers requested the chain supermarket stores which purchased from Jerseymaid to carry one or more of these other widely advertised brands. The producers of these brands of milk and milk products consistently solicited the owning supermarkets for the sale of their products to these chainstores during the years 1948 through 1952, but without success. The Alexander Markets, Inc., Carty Bros., Fitzsimmons Stores, Ltd., Market Basket, and Von's Grocery Stores were not interested in stocking the products of other milk producers because of their extremely profitable ownership interests in Jerseymaid which made it advantageous to them to handle Jerseymaid products exclusively. No actual consumer demand for Jerseymaid products existed during the period August 1, 1947, to January 12, 1952.

The acquisition of the Jerseymaid properties by a new owner on or about January 12, 1952, would have cost it the exclusive, if not the entire, patronage of its five food chain customers. In the event of the sale of the corporation's assets on January 12, 1952, it would have been more profitable to the five stockholder-customers to form a new captive creamery and distributorship, and to transfer their patronage from Jerseymaid to the new captive, than to continue to purchase from Jerseymaid or another noncaptive dairy. No contracts existed in January 1952 between Jerseymaid and any of its customers which required them to continue their patronage of the corporation. Other supermarket chains in the Los Angeles area owned captive distributors in 1952, not only of dairy products but of other commodities also. Ownership of a captive dairy or creamery was extremely attractive to large grocery chainstores in California because of the opportunity for realizing both the wholesaler's and the retailer's margin of profit and the protective price "umbrella" resulting from the favorable cost analyses and pricing practices employed by the California director of agriculture.

Jerseymaid was poorly equipped to capture a portion of the noncaptive milk market in the metropolitan Los Angeles area during 1952. It maintained no sales force of any kind. Its truckdrivers and deliverymen were accustomed to making volume milk deliveries but knew nothing of house-to-house delivery techniques. Its trucks were custom-built (25- to 30-foot "semis" hauled by a tractor) and were about twice the size of the average house-to-house and store delivery truck. These trucks were not adaptable to noncaptive operations. The entire Jerseymaid enterprise was designed to minimize processing, delivery, and marketing costs rather than to satisfy individual retail customers. Jerseymaid's name was associated by retail grocers as well as the general public with the five supermarket chains which handled its products on January 12, 1952.

During January 1952, a plentiful milk supply was available at the producer level in the Los Angeles area. Milk shortages developed temporarily in April 1952 and for short periods during that summer and fall. During these temporary shortages in milk supply, additional milk could usually be obtained by Los Angeles milk processors from the San Joaquin Valley area. On January 12, 1952, no shortage in milk of substantial duration was foreseeable in the metropolitan Los Angeles area.

On January 12, 1952, Jerseymaid was liquidated and all of its assets were distributed in kind to petitioners who (with certain exceptions noted below) were its stockholders at the time of liquidation.[8] They reported on their income tax returns the amounts received in liquidation of the corporation.

On January 13, 1952, the former stockholders of the corporation formed a partnership under which to continue the ownership and operation of the Jerseymaid business. All of the assets distributed in the liquidation of Jerseymaid, with the exception of some cash, were contributed on January 13, 1952, to Jerseymaid Milk Products Co., the successor partnership. All of the former stockholders of the corporation became partners in the partnership business (and remained partners at all times here material) and conducted it in substantially the same manner as it previously had been carried on by the corporation.

The respondent determined that Jerseymaid possessed goodwill on January 12, 1952, in the amount of $537,500 and that this asset was

---

[8] Petitioners Donal A. Carty and Agnes Morning Carty were partners with Henry J. Carty in Carty Brothers on January 12, 1952. Carty Brothers was then a stockholder in Jerseymaid. Petitioners Esther Marzullo, Sara Ann Carty, Estate of Henry J. Carty, Deceased, and Mary Louise Carty did not own stock in Jerseymaid on January 12, 1952. Esther Marzullo and Sara Ann Carty are the wives of petitioners James Marzullo and Donal Carty, respectively, and filed joint income tax returns with their husbands for each of the years in issue. Petitioner Mary Louise Carty is the widow of Henry J. Carty and filed joint income tax returns with him for each of the years in issue.

distributed to its stockholders on that date but not reported by them on their income tax returns.

ULTIMATE FINDING OF FACT.

A willing purchaser of Jerseymaid assets on January 12, 1952, fully informed of all relevant facts, would not have been willing to pay more than the fair market value of the Jerseymaid fixed tangible assets on that date. The corporation did not own goodwill on January 12, 1952, and none was distributed to its stockholders at that time.

OPINION.

The respondent determined that the fair market value of the assets of Jerseymaid Milk Products Company, Inc., on January 12, 1952, which were distributed to its shareholders on that date was at least $537,500 in excess of the value of the tangible assets and that such excess value was attributable to goodwill.

The petitioners have taken the position that Jerseymaid had no goodwill on that date and that they properly reported the gain realized by them on their distributive shares of the tangible assets of the corporation upon liquidation.[9] In the alternative, petitioners contend that in the event we find that Jerseymaid actually had transferable goodwill at the time of liquidation, the value of such goodwill was substantially less than the amount determined by the respondent.

In support of his contention that Jerseymaid possessed goodwill on January 12, 1952, the respondent relies heavily upon its exceptional earning record, the good quality of its product, the advertising of its products, both by the company itself and by one of its chain supermarket customers, and the resulting public acceptance of the Jerseymaid name. The respondent insists that these factors in combination clearly establish the existence of substantial goodwill value on the part of Jerseymaid which was transferred to its shareholders upon liquidation.

---

[9] I.R.C. 1939.

SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(c) DISTRIBUTION IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. * * *

SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

It is strikingly apparent from this record that Jerseymaid had a high earning record throughout the period August 1, 1947, to January 12, 1952, and possessed the ability to continue to earn substantial income. With an initial capital investment of $300,000 on August 1, 1947 (subsequently increased to $365,000), Jerseymaid earned net income before taxes and depreciation for the years 1948 through 1951 of $2,152,637.88. Obviously such a business, possessing an established market for its products, normally would command from a prospective buyer a price substantially in excess of the value of its tangible assets. Further, Jerseymaid produced a good competitive product, possibly slightly better in quality than many of those produced by competing dairies and creameries in the metropolitan Los Angeles area at that time. The record also shows that the Jerseymaid name had acquired rather widespread public acceptance in that area by 1952. But in the circumstantial context presented here, do these factors necessarily establish the existence on January 12, 1952, of transferable goodwill for tax purposes?

Goodwill, although variously defined, has been described by us as "nothing more than the probability that the old customers will resort to the old place." *Malcolm J. Watson*, 35 T.C. 203; *Rodney B. Horton*, 13 T.C. 143. It is well established that the ability of a business to produce large earnings, although a highly significant factor, does not of itself constitute goodwill. *Estate of Leopold Kaffie*, 44 B.T.A. 843; *Estate of Henry A. Maddock*, 16 T.C. 324.

A necessary element in the recognition of goodwill for tax purposes is *the expectancy of realizing in the future* the high margin of profit produced by the same business in the past. *Estate of Leopold Kaffie*, *supra*. There must be a transferable expectancy of continued earnings in excess of a fair return on the tangible assets of the business. *Estate of Robert R. Gannon*, 21 T.C. 1073; *Estate of A. Bluestein*, 15 T.C. 770; *Estate of Henry A. Maddock*, *supra*. As the respondent has recognized in a published ruling (Rev. Rul. 60–301, 1960–2 C.B. 15), for tax purposes goodwill can only exist where it is shown that the seller of a business transferred to the buyer a reasonable anticipation of the continuation of the previous high level of earnings. Patently, unless a prospective purchaser of the business can count upon the unimpaired continuation of its previous sales level and upon receiving the continued patronage of the existing customers, he normally would refuse to pay a premium for its assets. In *Estate of A. Bluestein*, *supra*, in discussing the problem of valuing goodwill, we stated:

It is important to point out * * * for the purposes of the discussion to follow, that in our opinion the emphasis in valuation of good will should be placed on the relation between the tangible assets and profits but only to the extent that those profits would survive a change in the management of the business. In attempting to place a value on the good will of a business, it is necessary, therefore, to place one's self in the position of a purchaser of the business and answer

the question—How much am I willing to pay for this salable asset, the ability of this business to earn *for me*, profits over and above a fair return on the tangible assets? It is important to remember then, that when the purchaser of a business pays a price for good will, he is not paying for the profits in the past in excess of a fair return on tangibles, but for those profits of the future.

Consequently, where it appears that the earning power of a business depends upon an asset or business advantage which the seller is powerless to convey to the buyer, such as a nonassignable franchise,[10] the personal qualifications and professional skill of the owner,[11] or an unusual consumer demand for the product of the business,[12] the decisions of this Court consistently have held that from a legal and tax standpoint, no marketable goodwill exists. *Charles F. Coates*, 7 T.C. 125; *Willoughby J. Rothrock*, 7 T.C. 848; *Danco Co.*, 14 T.C. 276. Thus, the fundamental issue presented here is whether the previous sales level and general earning ability of Jerseymaid would have survived a change in the ownership of its properties on January 12, 1952.

As we have detailed in our Findings of Fact, Jerseymaid Milk Products Co., Inc., was a "captive" dairy on January 12, 1952, the date of liquidation and had operated as such throughout its existence. At the time of its liquidation, the corporation had seven stockholders. Eighty percent of its stock was owned by five shareholders which were supermarket chains (totaling 120 retail outlets among them) patronizing Jerseymaid.[13] During 1948, 1949, 1950, and 1951 the purchases of these supermarket chains from Jerseymaid ranged from 86.4 percent to approximately 92 percent of its total sales. With minor exceptions, Jerseymaid was the sole supplier of milk and milk products to these five grocery chains. The balance of the stock was owned by W. J. Thiessen and James Marzullo, who were the founders and full-time managers of the business. Jerseymaid's large earnings were due to its ability to purchase commodities in large quantities, dispense with sales and collection personnel, utilize the most modern equipment, and make volume deliveries to an established market. Because of the rigid control of milk prices in California (Cal. Agric. Code, secs. 735 (c), 735.4(b), and 736.11), the prohibition of discounts and rebates (Cal. Agric. Code, secs. 730.2 and 736.13), the comparatively low operating costs and consequent high margin of profit made possible

---

[10] *Floyd D. Akers*, 6 T.C. 693.

[11] *D. K. MacDonald*, 3 T.C. 720. However, the courts have recognized that even in a professional business there can be a salable expectancy of continued excess earnings where it is established that the customers have come habitually to look to the place rather than to the individual. *Rodney B. Horton*, 13 T.C. 143 (sale of public accounting practice); *Malcolm J. Watson*, 35 T.C. 203 (sale of public accounting practice); *Merle P. Brooks*, 36 T.C. 1128 (sale of clinical orthodontic practice); *Rees* v. *United States*, 187 F. Supp. 924 (D. Ore. 1960) (sale of orthodontic practice); cf. *Masquelette's Estate* v. *Commissioner*, 239 F. 2d 322 (sale of interest in accounting firm).

[12] *Estate of Leopold Kaffie*, 44 B.T.A. 843.

[13] Five retail grocery chains owned 80 percent of the outstanding Jerseymaid stock on January 12, 1952. On August 1, 1947, supermarket chains held approximately 77 percent of the corporation stock. As a result of the occasional changes in shareholdings throughout the life of the corporation, retail grocery chains held between 77 and 80 percent of its stock between August 1, 1947, and January 12, 1952.

by a captive operation, and the cost factor normally utilized by the State director of agriculture in establishing minimum wholesale milk prices which favored captive creameries and effectively placed over them a protective "umbrella," Jerseymaid in 1952 had a virtually guaranteed market among its grocery chain stockholders.

The question, then, that we seek to answer from the record is: On January 12, 1952, was there a reasonable expectancy that the supermarket chains which owned 80 percent of Jerseymaid's stock and which were its only significant customers would continue their patronage in the event of a sale of its assets? None of these supermarket chains began to purchase the products of the corporation until they first had acquired an ownership interest in Jerseymaid, and the obvious purpose of each grocery chain in acquiring stock therein was to share in the large profits made possible by its captive operation. And, likewise, the sole purpose of the owning supermarket chains in buying Jerseymaid products was to enhance its (and thereby their own) profit-making potential. Mayfair Markets sold its Jerseymaid stock on March 8, 1948, and the stock owned by Shopping Bag was redeemed by the corporation on October 7, 1948. Each of these food chains was a customer of Jerseymaid in 1948, but ceased to be thereafter. The earnings capability of the corporation throughout its existence clearly was dependent upon its captive relationship with its shareholder-customers. This competitive advantage which Jerseymaid possessed, as compared with noncaptive dairies, was a factor it seemingly would have been unable to convey to a purchaser of its properties.

The respondent claims that the good quality of Jerseymaid milk and milk products was one advantage which would have induced a purchaser of its assets to pay a premium therefor. It is true that Jerseymaid won State recognition for the quality of its dairy products and that the butterfat content of its milk (3.6 percent) exceeded by one-tenth of one percent the required minimum. The testimony presented at the trial disclosed that Jerseymaid's milk was "comparable," "as good as or better," or "just a little bit better" than that produced by competing dairies. However, there is nothing in the record to indicate that the good quality of its milk resulted from any patents, special techniques, "know-how," trade secrets, or sources of commodity supply that would have been unavailable to any other creamery. All milk sold in the Los Angeles area in 1952 was subject to rigid qualitative standards, and competing brands also were of good quality and won numerous awards in recognition of their merit. We cannot find from this record that Jerseymaid milk was sufficiently superior, if at all, to competing brands of milk to elicit any consumer demand or to cause a purchaser of the corporation's assets to pay more for their acquisition than the fair market value thereof.

The evidence presented also clearly indicates that no ascertainable retail demand existed for Jerseymaid products in 1952. The respondent points to the advertising of the corporation's products as proof of an established trade name and consumer demand. Jerseymaid's milk was widely advertised for several years in the Los Angeles area by at least one of the grocery chains which owned stock therein, and to some extent by the corporation itself. The amount of advertising carried on by the corporation was relatively small as compared with noncaptive dairies. In 1951 its advertising expense amounted to $63,-720 as compared with total sales in that year of $14,588,828.61. The record shows that the purpose of this advertising was to familiarize the public with the Jerseymaid name and thus to create consumer acceptance at the retail level. The effect of such advertising was insufficient to stimulate customer requests for Jerseymaid products from stores other than the outlets of the owning grocery chains, and fell short of creating actual consumer demand. Jerseymaid's name was associated by the general public in the Los Angeles area with the five supermarket chains which handled its products on January 12, 1952. Consumer acceptance of the corporation's products was achieved because these supermarket chains marketed them. It is apparent that the reputation of the supermarket, if high, usually would sell a product for the first time. If the quality proved to be acceptable, the purchaser normally would continue to buy it. Mere passive *acceptance* of a product is not an element of goodwill, for it does nothing to increase profit over the ordinary profit to be expected from investment, whereas *demand* for a product does tend to create goodwill, for demand is the basis for greater profit than that which is ordinarily to be expected from investment.

The record discloses that the highly profitable arrangement which existed on January 12, 1952, between Jerseymaid and its five significant customers almost certainly would have been destroyed in the event of a sale of its assets to a stranger at that time. The acquisition of Jerseymaid's assets by a new owner would have cost it the exclusive, if not the entire, patronage of its five chainstore customers. No contracts existed in 1952 between Jerseymaid and its five customer-stockholders requiring them to continue buying from the corporation. Theodore Von der Ahe, president of one of the grocery chain stockholders, testified on direct examination that "if the member companies withdrew their support tonight Jerseymaid would not have a single customer in the morning, nor the expectancy of getting any." (Tr. 154.)[14]

Representatives of other creameries were continually requesting the

---

[14] Von der Ahe subsequently stated on redirect examination: "had the customers of Jerseymaid withdrawn their support, Jerseymaid would have had no customers at all. It would have just had physical properties and no business." (Tr. 185.)

five owning supermarket chains to carry their products during 1948 through 1952. If the Jerseymaid properties had been sold to a new owner at the time of its liquidation in 1952, the very best it reasonably could have anticipated would have been to become one of several intensely competitive creameries competing to supply one or more of its five formerly exclusive customers. At most, it would have been able to retain only a fraction of its previous market, and the distribution of milk and milk products to even that fraction would have involved additional route overhead and a higher delivery cost than it would have incurred as a captive dairy.

Considerable testimony was presented at the trial by officers of the five grocery chains owning stock in Jerseymaid to the effect that if these supermarket chains were to dispose of the assets of the corporation, they would form their own captive creamery rather than continue to patronize Jerseymaid or another noncaptive distributor. It is apparent from the particular competitive circumstances prevailing in the Los Angeles area in 1952 that each of the five grocery chains which owned stock in Jerseymaid if deprived of their ownership of its properties would have found it more profitable to form their own captive supplier of milk than to continue buying from Jerseymaid. Other supermarket chains in that area owned captive distributors in 1952, not only of dairy products but of other commodities also. The opportunity for enjoying both the wholesaler's and the retailer's margin of profit, plus the protective price "umbrella" resulting from the favorable cost analyses and pricing practices of the California director of agriculture, made ownership of a captive creamery extremely attractive to large grocery chain distributors.

Accordingly, a prospective purchaser of Jerseymaid's assets on January 12, 1952, reasonably could have looked forward to the loss of the greater portion of the patronage of its five principal customers, if not all of it, and the formation by them of a new captive dairy. It is therefore clear from this record that if a new owner had purchased the Jerseymaid assets in 1952, such an acquisition in effect would have cut off its guaranteed market and would have compelled it to "start from scratch" in developing new customers for its dairy products.

Upon acquisition of the Jerseymaid properties, a new owner would have found himself with a noncaptive creamery practically stripped of customers and, because of the highly competitive state of the creamery industry in Los Angeles in 1952, very likely would have been forced to shift to an entirely different kind of creamery operation. If the corporation had lost the patronage of the five large grocery chains owning stock therein, as it almost certainly would have, it would appear to have been practically impossible for it to have obtained other large supermarket chains as customers, for if they did not themselves own captive creameries, they scarcely would have been

interested in marketing a brand previously available only in and closely identified with competing supermarket chains. Instead of selling its products in large volume to supermarket chains, Jerseymaid seemingly would have been compelled to capture a portion of the market held in 1952 by large noncaptive creameries. After the loss of its five virtually guaranteed volume customers to a successor captive, Jerseymaid would have been left in a tight competitive situation: it would have been forced to scramble with the well-known, long-established noncaptive creameries for every sales dollar it could obtain from small chainstores, hundreds of independent grocers, and house-to-house customers.

Jerseymaid was poorly equipped to penetrate the noncaptive milk market in the metropolitan Los Angeles area during 1952. Such an undertaking would have been costly to the corporation. Its entire enterprise was designed to minimize processing, delivery, and marketing costs rather than to satisfy retail customers. Its fleet of custom-built delivery trucks (25- to 30-foot "semis," hauled by a tractor) were about twice the size of the average store delivery truck and would have been extremely cumbersome and inefficient for the house-to-house and corner grocery markets. As a noncaptive, Jerseymaid's low per-unit cost of production, attributable to its high volume captive operation, inevitably would have increased sharply. The established noncaptives in the Los Angeles area incurred considerably higher operating costs than Jerseymaid during 1948 through 1952. No salesmen or sales managers were needed by the corporation as a captive, but such personnel would have been necessary if it had changed to a noncaptive distributor. During the period August 1, 1947, to January 12, 1952, Jerseymaid deliveries were made in volume, the delivery points were comparatively few, and the whole delivery system became "almost an automatic procedure." But, as a noncaptive, its deliveries to numerous small grocery stores and house-to-house customers would have been radically different. Not only were its trucks not adaptable to noncaptive operations, but its drivers were unfamiliar with house-to-house delivery techniques.

A purchaser of the corporation properties in 1952 obviously would have been pitting an inexperienced management and staff, saleswise, against the experienced survivors of noncaptive competition and, in its effort to capture a portion of the noncaptive market, in most cases would have been attempting to break up an established relationship between a prospective customer and his previous supplier. And because of the California milk control laws, no price incentive would have been available to Jerseymaid in its endeavor to penetrate the noncaptive market.

It does not then appear that a prospective purchaser of the Jerseymaid assets on January 12, 1952, viewing the prospect of losing the

corporation's five principal customers and the strong possibility of being compelled at considerable expense to capture a part of the noncaptive market for survival, would have been willing to pay more than fair market value for the fixed tangible assets thereof.

The respondent relies strongly upon the expert testimony of an agricultural economist who gave his opinion that Jerseymaid possessed goodwill worth $537,500 because of its reputation, established trade name, the recognized quality of its product, a well-organized operational labor force, and favorable relationships with its customers and suppliers. The respondent's determination of transferable goodwill in the amount of $537,500 at the time of liquidation was based upon the assumption that a prospective purchaser of the corporation's assets reasonably could have anticipated the unimpaired continuation of its previous sales level as a captive operation. This assumption has been shown by the record to be patently false. The captive arrangement under which Jerseymaid conducted its operations doubtless would have constituted a formidable deterrent to the payment of a premium in excess of fair market value for its properties by an informed purchaser thereof.

Even if some goodwill attached to Jerseymaid in January 1952—and in a purely economic sense it may well have existed by virtue of its recognized trade name and qualitative reputation—it realistically cannot be held from this record that this intangible was of a salable nature. Of what value to a buyer of Jerseymaid would its trade name and reputation have had as giving him "a reasonable expectancy of preference in the race of competition" [15] where the sellers of the business remove from the market place more than 86 percent of its established customers? We are unable to conceive of the recognition for tax purposes of the transfer of goodwill in a situation where the disposition of the business itself would "kill the goose that laid the golden egg." We accordingly hold that Jerseymaid did not own recognizable goodwill for tax purposes on January 12, 1952, and no such asset was received by its stockholders at the time of its liquidation.

*Issue 2. Value of Automotive Equipment.*

FINDINGS OF FACT.

Jerseymaid Milk Products Co., Inc., owned approximately 88 items of automotive equipment on January 12, 1952, which were distributed in liquidation to its stockholders on that date. This equipment consisted largely of truck tractors and van-style "semis" used for milk and frozen food deliveries, general hauling tractors, tanker "semis," bobtail trucks, and egg delivery trucks. A substantial portion of the equip-

---

[15] *In re Brown*, 242 N.Y. 1, 150 N.E. 581.

ment was custom-built, particularly the milk delivery "semis." The average age of these pieces of automotive equipment was approximately 6 years. The total cost of Jerseymaid's automotive equipment was $379,125.46, accumulated depreciation thereon as of January 12, 1952, amounted to $218,257.01, and the book value thereof on that date was $160,868.45.

On January 5, 1952, the assets of the corporation (with the exception of its herd of dairy cattle) were appraised by a firm of valuation engineers. Jerseymaid's automotive equipment was appraised as having a fair market value on that date of $384,052.

Jerseymaid Milk Products Co., the successor partnership, entered $384,052 on its books as the cost of its automotive equipment, and the same amount was reported by petitioners on their income tax returns as the fair market value of the partnership's automotive equipment at the time of acquisition, January 12, 1952.

The respondent has determined that the fair market value of petitioners' automotive equipment on January 12, 1952, was $326,000.

The fair market value of the automotive equipment distributed to petitioners on January 12, 1952, was $326,000 on the date of distribution.

#### OPINION.

To sustain their position that the fair market value of the automotive equipment received from Jerseymaid at the time of its liquidation amounted to $384,052,[16] petitioners rely upon the appraisal of its assets on January 5, 1952, by a valuation engineer and his testimony at the trial. He testified that his method of appraising the automotive equipment was first to determine the current replacement cost of each item and then adjust this amount by the actual depreciation realized on the Jerseymaid equipment. The resulting figure was listed in his valuation report as "sound value" which, according to his testimony, represented the fair market value of the equipment as part of a going business, viz, a wholesale dairy. He explained that much of this equipment was extremely scarce in 1952 and, due to the Korean War, was difficult if not impossible to replace.

Because of the fact that a substantial portion of Jerseymaid's equipment was custom-built and was extremely difficult to obtain at any price in 1952 due to the exigencies of the Korean War and doubtless would have brought a premium price from a purchaser of the Jerseymaid enterprise or another captive dairy conducting the same type of operation and needing the same type of equipment, we are persuaded that its automotive equipment was worth considerably more on January 12, 1952, than its book value ($160,868.45) on that date.

---

[16] On brief, petitioners concede error in the appraisal of a 1941 Plymouth coupe which was purchased in 1941 for $971 and appraised at $1,018 on January 5, 1952.

However, we are not convinced from petitioners' professional appraisal and the testimony of their valuation engineer that this equipment, after having been used for 6 years on the average, was worth more than $326,000, the amount determined by the respondent. The replacement cost of the equipment, although some indication of fair market value, is by no means conclusive and in fact has been held to be of questionable weight as valuation evidence. *Greenabaum Brothers, Inc.*, 6 B.T.A. 86; *Frost Manufacturing Co.*, 13 B.T.A. 802; *American Steel Wool Mfg. Co.*, 14 B.T.A. 762; and *National Packing Corporation*, 24 B.T.A. 952.

We are of the opinion that petitioners have failed to sustain their burden of showing by clear and convincing evidence that the automotive equipment distributed to them by Jerseymaid on January 12, 1952, had a fair market value on that date in excess of the amount determined by respondent. Accordingly, respondent's determination must be sustained.

*Decisions will be entered under Rule 50.*