PRODUCER'S GRAIN & GIN COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Producer's Grain & Gin Co. v. Commissioner
Docket No. 35496-84.
United States Tax Court
T.C. Memo 1987-370; 1987 Tax Ct. Memo LEXIS 370; 53 T.C.M. (CCH) 1460; T.C.M. (RIA) 87370; July 27, 1987. Fletcher C. Lewis, for the petitioner. Howard P. Levine, for respondent. PARR
MEMORANDUM FINDINGS OFF FACT AND OPINION PARR, Judge: Respondent determined an income tax deficiency for petitioner's taxable year ended February 28, 1982 in the amount of $ 114,397.54. The sole issue is whether petitioner properly allocated the price it received for its business between its depreciable and nondepreciable assets. *371 Respondent contends petitioner allocated too little to depreciable assets and too much to goodwill, resulting in the underreporting of $ 243,462.58 in depreciation recapture under sections 1245 [1] and 1250. FINDINGS OF FACT During the taxable year in issue, petitioner was an Arkansas corporation engaged in the business of ginning cotton. Its principal place of business was at Winchester, Arkansas. Petitioner was owned equally by Clarence W. Day ("Clarence") and his sons William, Charles Raymond ("Raymond") and Danny. Day Farms, Inc. ("Day") was engaged in the business of growing cotton. Day was owned by Clarence, his wife and his children in the following proportions: Stockholder
Shares
Clarence W. Day
329
Gladys Day
1
Charles Raymond Day
45
Ricky Day
45
Danny Day
45
William Day
45
David Day
45
Sue Day
45
Total:
600
Prior to the summer of 1981, two of petitioner's shareholders became interested in buying out the interests *372 of the other two. The Day family therefore decided to consolidate the operations of petitioner and Day. On advice of the law firm of Smith, Smith & Hubbell ("Smith"), the consolidation was structured as a sale of petitioner's assets to Day, followed by a liquidation and distribution of the sale proceeds to petitioner's shareholders pursuant to section 337. As reflected in the minutes of a June 7, 1981 meeting of Day's directors and shareholders, it was important to Clarence for tax purposes that a part of the sales price be allocated to petitioner's goodwill. The directors resolved at the June 7 meeting that Day should purchase petitioner's assets for $ 600,000 in cash plus the assumption of petitioner's liabilities accrued at the time of the closing. [2] On June 18, 1981, petitioner and Day entered into a contract for the purchase and sale of the corporate assets of petitioner. The contract is not in the record. On July 31, 1981, the sale of the petitioner's assets was consummated. *373 The purchase price consisted of $ 600,000 in cash [3] and the assumption of $ 814,596.71 in liabilities for a total saled price of $ 1,414,596.71. [4]
On April 10, 1981, William A. Payne of Appraisal Consultants, Inc., provided a bank with a certified appraisal of petitioner's land and depreciable assets as of March 26, 1981. [5] The appraisal valued the depreciable assets at $ 948,000 and the land at $ 10,000. [6] No intangible assets were valued. Payne used a "cost approach" to value petitioner's *374 depreciable assets. Under this approach, he determined the reproduction cost of the equipment and improvements, and allowed for depreciation [7] to arrive at depreciated reproduction cost value. [8]
Payne equated depreciated value in this case with market value, because he thought that a gin of the quality of petitioner's would attract a buyer. According to Payne, depreciated value is ordinarily to be distinguished from fair market value. But where there are no comparable sales available, yet the assets could be expected to attract a buyer, the "value-in-use" (in this case, the depreciated value) is equivalent to the market value, according to Payne. Petitioner offered the valuation *375 testimony of one Bob Norsworthy. Norsworthy has extensive experience managing, operation and manufacturing cotton gins, and had first hand knowledge of petitioner's business as a going concern. In 1981, however, Norsworthy contracted to dismantle and move to Arizona a gin similar to and situated near petitioner's. The purchase price for the gin was $ 350,00. Norsworthy testified that petitioner's depreciable real estate had no value because it could be used for no purpose other than ginning cotton at petitioner's site. The profitability of a gin is tied to how much cotton is ginned there. Petitioner's gin was profitable baling about 10,000 bales of cotten a year, and may have been profitable baling less. About half the cotton petitioner baled during the year in issue, or about 5,000 sales was supplied by the Day family. Norsworthy and Payne substantially agreed that the value of the ginning equipment alone was between $ 350,000 and $ 500,000. [9] Taking into account the profit yield to be expected with continued patronage by the Day family, however, the value of the gin would be much higher. *376 Day's accountant, Robert Hardin, used the Payne appraisal figures to compute the cost basis of the assets Day purchased from petitioner. On Day's original 1981 corporate income tax return, Hardin valued petitioner's depreciable tangible assets at $ 931,000. Hardin prepared Day's 1982 and 1983 returns using the same figures. [10] Some of five months after the original 1981 return was filed, however, James Michael Smith of the Smith law firm filed an amended corporate income tax return for Day. The stated purpose of the amended return was to reduce to $ 610,802 the basis in depreciable assets "inadvertently" overstated on the original return. [11] The figures on the amended return were determined by Clarence and James Michael smith, who, with Raymond's help, simply went through schedules of the assets purchased, looked at their book value, considered what they thought they might possibly bring on the market if sold piecemeal "or -- whatever we just felt the price of -- or whatever the worth of that piece of equipment was." [12]
*377 On its final corporate tax return for the year ending February 28, 1982, [13] petitioner reported total sales prices of $ 610,802 for depreciable tangible assets. Petitioner reported depreciation recapture of $ 101,655. Respondent determined that the section 1245 and 1250 recapture for petitioner's final taxable year was underreported in the amount of $ 243,462.58, attributable to an excess allocation to gooodwill. Day's original return for its tax year ending February 28, 1982, allocated $ 128,694.27 of petitioner's price to goodwill. OPINION On the sale of certain depreciable assets, some or all of the resulting gain may be "recaptured" as ordinary income. Secs. 1245, 1250. See Allan v. Commissioner,86 T.C. 655, 667 (1986); Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 445 (1980). It is therefore in the interest of a taxpayer selling a business containing recapture assets to minimize gain with respect thereto by allocating as little as possible of the total amount realized to those assets and as much as possible of the total amount realized to those assets and as much as possible *378 to other assets. It is in the buyer's interest to do the opposite, in order to obtain a high basis in tangible assets for purposes of future depreciation. Here the principal shareholders for both buyer and seller were the same individuals. In general, an arm's-length agreement between a buyer and seller with adverse interests will establish the allocation. Sec. 1.1245-1(a)(5), Income Tax Regs. If we were to find this principle applicable at all here, [14] it would be to find that the individuals controlling the transaction, i.e., petitioner's owners (who were also Day's owners), agreed among themselves to accept the Payne appraisal as the basis upon which any allocation was made. Evidence of this may be found in Day's original 1981 return, its 1982 and 1983 returns, and Day's books of account. Moreover, it may reasonably be inferred that the Payne appraisal, made less than 4 months before the sale, formed the basis upon which petitioner's purchase price was determined. *379 We need not, however, find that petitioner has made an allocation agreement which he seeks to disavow to hold for respondent. [15] looking to the appropriate facts and circumstances, as we are required to do, [16] we uphold respondent's allocation. Petitioner's allocation must be made according to its assets' fair market value. [17] In this case, however, petitioner made a thinly veiled attempt to revalue, after the fact, its assets so as to reduce its recaptured income. *380 Petitioner offered valuation evidence from only Clarence and Norsworthy. Although an owner may testify as to the value of his property over an objection to opinion evidence by a lay witness, [18] we may weigh that testimony as we would any other, and credit it accordingly. Here, Clarence was infused with bias. Moreover, there has been no showing that he regularly or recently dealt in any of the assets at issue. His setting of values with Mr. Smith strikes us rather more like plotting for tax benefits than attempting in good faith to determine fair market values. [19] We discount his opinion as to value entirely. Norsworthy testified about one liquidation sale. First, the assets involved in that sale were only generally and therefore insufficiently equated with the assets at issue here to be relied on. Second, only one sale under such unusual conditions cannot form a "market" from which we can draw evidence *381 of comparable sales. We therefore disregard Norsworthy's testimony as well. If we were writing on a clean slate, we might not adopt the Payne appraisal in its entirety. [20] Petitioner, however, has not met its burden of proving that respondent erred in basing his determination on that appraisal. In so ruling, we are mindful that it was obtained at petitioner's behest, not respondent's. [21]
*382 To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code as in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. The resolution stipulated that assumption of liabilities would be undertaken provided that they "have not increased unreasonably" between the time of the resolution and the time of closing. ↩
3. On petitioner's liquidation, its four shareholders each received distritubions of $ 169,000 in cash. The source of the excess cash is not apparent. ↩
4. Petitioner contends the sale price was actually $ 1,196,343.36. The discrepancy arises because petitioner only accounted for liabilities Day paid at the time of closing and not $ 218,253.35 of accrued liabilities Day assumed and carried on its books. ↩
5. Although the appraisal in the record is unsigned, Payne authenticated it through his testimony. ↩
6. $ 285,000 of the $ 948,000 was attributable to depreciable real estate, $ 607,000 to equipment and $ 56,000 to rolling stock. Payne rounded his figures to the nearest thousand. ↩
7. Payne was not specific with respect to how asset depreciation was computed. He defined depreciation, and noted that he obtained useful life figures from a company that manufactured at least some of the gin equipment, but did not describe what any particular item was depreciated any particular amount. ↩
8. Although the report is not perfectly clear, it appears that, for purposes of the report, replacement cost plus installation cost equals depreciated reporduction cost, of depreciated value. ↩
9. Payne put the figure at $ 40- $ 50 per bale, or $ 400,000- $ 500,000 for petitioner's gin. Payne's use of a value-per-bale formula may imply an element of going concern value. Moreover, it leaves us without knowledge of what the 10,000 bale multiplier is based on (capacity, annual amount balled, amount required for profit, etc.). Payne testified that his figure was the equipment's liquidation value, however, and we accept it as such. ↩
10. Day's books and records were also kept on the basis of the Payne appraisal, with $ 931,000 being used as the book value for depreciable tangible assets purchased from petitioner. ↩
11. This was done so that the depreciable basis Day claimed would correspond to the depreciable basis petitioner asserted on its final 19812 corporate income tax return. ↩
12. Clarence owns 60 percent of Day. Raymond is also a shareholder. Except for its amended 1981 return, Day has consistently claimed the larger basis on its returns and corporate books. ↩
13. This return was prepared by the Smith firm. ↩
14. The predicates for application of this principle are arm's-length bargaining, an agreement and adversity of interest between buyer and seller. Petitioner has not shown that these predicates exist here, and, given the fact that the same family members are the principal shareholders in both entities, we do not believe arm's length dealing could possibly be shown. Further, family business transactions such as this warrant special scrutiny. See Baird v. Commissioner,25 T.C. 387, 395↩ (1955). 15. For this and other reasons, we need not address whether petitioner's attempt to claim a value for the tangible assets lower than Payne determined or its attempt at trial to claim a value lower than that claimed on its return should be tested under the "strong proof" or "Danielson" rule. See Elrod v. Commissioner,87 T.C. 1046, 1065-1066↩ (1986). 16. See sec. 1.1245-1(a)(5), Income Tax Regs.↩
17. Sec. 1.1245-1(a)(5), Income Tax Regs., provides as follows: (5) In case of a sale, exchange, or involuntary conversion of section 1245 and nonsection 1245 property in one transaction, the total amount realized upon the disposition shall be allocated between the section 1245 property and the nonsection 1245 property in proportion to their respective fair market values. In general, if a buyer and seller have adverse interests as to the allocation of the amount realized between the section 1245 property and the nonsection 1245 property, any arm's length agreement between the buyer and the seller will establish the allocation. In the absence of such an agreement, the allocation shall be made by taking into account the appropriate facts and circumstances. Some of the facts and circumstances which shall be taken into account to the extent appropriate include, but are not limited to, a comparison between the section 1245 property and all the property disposed of in such transaction of (i) the original cost and reproduction cost of construction, erection, or reproduction cost of construction, erection, or production, (ii) the remaining economic useful life, (iii) state of obsolescence, and (iv) anticipated expenditures to maintain, renovate, or to modernize.
Sec. 1.1250-1(a)(6), Income Tax Regs.↩, provides similar rules for sec. 1250 property. 18. See Neff v. Rehoe,708 F.2d 639 (11th Cir. 1983); LaCombe v. A-T-O, Inc.,679 F.2d 431 (5th Cir. 1982); District of Columbia v. 13 Parcels of Land,534 F.2d 337↩ (D.C. Cir. 1976). 19. See supra↩ note 17. 20. We are not without reservations regarding Payne's value-in-use methodology. See Carty v. Commissioner,38 T.C. 46, 66 (1962); National Packing Corporation v. Commissioner,24 B.T.A. 952↩ (1931). 21. We are aware that in the Eighth Circuit, going concern value is distinct from goodwill. Northern Natural Gas Co. v. United States,470 F.2d 1107, 1110 (8th Cir. 1973), cert. denied 412 U.S. 939 (1973); see also Banc One Corporation v. Commissioner,84 T.C. 476, 508 (1985), affd. without published opinion 815 F.2d 75 (6th Cir. 1987); Solitron Devices, Inc. v. Commissioner,80 T.C. 1, 19-20 (1983), affd. without opinion 744 F.2d 95 (11th Cir. 1984); VGS Corporation v. Commissioner,68 T.C. 563, 591-592 (1977). We do not consider fatal, however, that respondent made no specific allocation to going concern value. Even courts make no distinction occasionally, and we will assume that what respondent called goodwill was actually a total figure for all of petitioner's intangibles. See Solitron Devices, Inc. v. Commissioner,80 T.C. at 19-20↩ (citing cases that do and do not distinguish between goodwill and going concern value).