Robert T. Barber, et al. 1 v. Commissioner. Barber v. CommissionerDocket Nos. 84475-84482.United States Tax CourtT.C. Memo 1963-206; 1963 Tax Ct. Memo LEXIS 140; 22 T.C.M. (CCH) 1025; T.C.M. (RIA) 63206; July 31, 1963Victor A. Sachse, Fidelity National Bank Bldg., Baton Rouge, La., for the petitioners. Charles B. Sklar, for the respondent. WITHEYMemorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in petitioners' gift tax liabilities for 1956 as follows: DocketNo.PetitionerDeficiency84475Robert T. Barber$13,093.4484476LaRue Frye Barber13,093.4484477Frank A. Barber101.2584478Chris Suarez Barber101.2584479Harry W. Barber3,930.0084480Augusta T. Barber3,930.0084481Aubrey L. Barber3,060.0084482Anna Laura Guillory Barber3,060.00*141 The sole issue presented for our decision is the determination of the fair market value of Barber Brothers Company, a partnership, on March 31, 1956. Findings of Fact The stipulated facts are found as stipulated. Petitioners Robert T. and LaRue Frye Barber, Frank A. and Chris S. Barber, Harry W. and Augusta T. Barber, and Aubrey L. and Anna Laura G. Barber are husbands and wives. They filed gift tax returns for 1956 with the director at New Orleans, Louisiana. Robert, Frank, Harry, and Aubrey Barber, sometimes hereinafter referred to as petitioners, and Louis P. Barber, during 1956 and for many years prior thereto, were engaged in the contracting business in the State of Louisiana. Their office and principal place of business at all times here pertinent were located at Baton Rouge, Louisiana. The petitioners, together with Louis P. Barber, have been active in the conduct of various Barber contracting enterprises. They were partners in the Barber Brothers Company as well as officers in several corporations which they from time to time have organized and operated. Barber Brothers Company, a partnership consisting of petitioners and Louis P. Barber, during 1956 and for several*142 years prior thereto, was engaged primarily in the performance of road surfacing and construction contracts with various state and local government agencies in Louisiana. In 1928, Robert, Frank, and Harry Barber and William H. Patterson organized Barber Brothers Construction Company, Inc. (sometimes hereinafter referred to as "Construction"), for the purpose of conducting a contracting business engaging primarily in public road construction. 2 Construction was formed under the laws of the State of Louisiana with its office and principal place of business located at Baton Rouge, Louisiana. During its fiscal years ended February 28, 1929, through February 28, 1934, the operations of Construction disclosed net profits or losses as follows: Fiscal year endedFebruary 28Net profit (loss)1929[36,156.67)193040,391.19193129,480.561932100,803.8619331,098.611934(23,055.51)On November 7, 1933, petitioners organized Barber Brothers Contracting Company, Inc. (sometimes hereinafter referred to as "Contracting"), under the laws of the State of*143 Louisiana, having its office at Baton Rouge, Louisiana. This corporation served as a holding company until sometime during 1934 when Barber Brothers Construction Company, Inc., surrendered its charter. At the time of the surrender of the corporate charter of Barber Brothers Construction Company, Inc., in 1934, Barber Brothers Contracting Company, Inc., assumed the operations of the contracting business which it continued until January 1, 1941. During 1941, Contracting discontinued the active conduct of its contracting business and again became a holding company with its principal assets consisting of cash, investments, and accounts receivable. During 1945, Contracting surrendered its corporate charter. During the years 1934 through 1945, Contracting earned net profits in the following amounts: December 31Net profit1934$ 5,031.83193512,956.90193641,017.9719378,803.70193811,272.64193920,006.2919406,372.00194127,502.11194214,342.2419432,050.6119441,037.1819451,721.64The officers of Barber Brothers Contracting Company, Inc., through the 12 years of its existence were F. A. Barber, President, H. W. Barber, Vice President, *144 W. H. Patterson, Vice President, and R. T. Barber, Secretary-Treasurer. During the years 1934 through 1945, the outstanding common stock of the corporation was owned as follows: Frank A. Barber 30 percent, Harry W. Barber 20 percent, W. H. Patterson 20 percent, and Robert T. Barber 25 percent. During September 1936, Frank, Robert, Aubrey, Harry, and Louis Barber and W. H. Patterson formed a partnership which conducted business as Barber Brothers Company. During the first few years of its existence, the principal function of Barber Brothers Company was the holding of title to the equipment and operating assets utilized by Barber Brothers Contracting Company, Inc., in its road construction operations. However, the partners gradually assumed an increasingly active role in the management of the contracting operations, and when Barber Brothers Contracting Company, Inc., discontinued active operations during 1941, Barber Brothers Company assumed the management of the entire Barber interests. Upon the surrender by Barber Brothers Contracting Company, Inc., of its corporate charter in 1945, its remaining assets were acquired by the partnership and its operations were conducted by the partners*145 under the name of Barber Brothers Company which continued to operate the contracting business until January 10, 1960, when a new Louisiana corporation, Barber Brothers Contracting Company, Inc., was formed to take over the contracting business. Barber Brothers Contracting Company, Inc., leased construction equipment from Barber Brothers Company. For each of the fiscal years ended August 31, 1939, and August 31, 1942, through June 30, 1945, Barber Brothers Company realized net profits as follows: Fiscal year endedNet profitAugust 31, 1939$ 50,144.80August 31, 1942285,249.11August 31, 1943483,267.65August 31, 1944330,997.70June 30, 1945294,200.53On August 24, 1945, William H. Patterson withdrew from the partnership of Barber Brothers Company. Upon his withdrawal he transferred his partnership interest in Barber Brothers Company to the remaining partners in exchange for certain partnership assets. On January 1, 1953, Frank, Robert, Aubrey, Louis, and Harry Barber executed a written partnership agreement. At the time of the execution of this agreement, the interest of each partner constituted an asset which, under the laws of the State of Louisiana, *146 belonged to the community property interest existing between each partner and his wife. The articles of partnership of Barber Brothers Company provided in pertinent part that the five brothers were the active partners and: shall have all powers of management of the partnership business * * * During the existence of the partnership no active member shall sell, assign, transfer or otherwise alienate the capital or interest in the partnership without first obtaining the written consent of the other active members, except to the extent expressly set forth in this Article and except to the extent set forth in Article VIII dealing with the death of a partner. The articles further provided that the partnership shall remain in effect until June 30, 1968. No limitation was placed upon the sale of the interest of limited or "commendam" partners and their interests are inheritable by their heirs or legatees. The agreement provided that death would not operate to dissolve the partnership. In the event of the death of a partner, the surviving active partners were granted the option of purchasing the interest of the deceased partner. If one partner notified the other active partners in writing*147 of his intention to withdraw voluntarily from the membership of the firm, the remaining partners had the option to purchase his interest. If the option is not exercised within 90 days: after the death of an active partner or after the receipt of notice of his intention to withdraw, the partner wishing to withdraw or the heirs and legatees of the deceased partners may, within the next ninety (90) day period, require that the partnership be liquidated, or the remaining or surviving partners may themselves by majority vote within that same ninety (90) day period require that the partnership be liquidated. In the event of liquidation, the remaining or surviving active partner or active partners shall act as liquidator or liquidators as the case may be. Article VIII of the partnership agreement further provides: So long as the partnership continues to operate on a completed contract basis of accounting, if the option is exercised, those from whom the interest is purchased shall also be paid as received an amount equal to one-half (1/2) of the interest of the retiring or deceased active partner in income from uncompleted contracts computed without deduction of the overhead expense*148 of the partnership. The agreement contains no restriction on the sale of an interest of a partner in commendam, no option to anyone to purchase the same, no right to insist upon liquidation if such interest is not purchased, and no formula with respect to the purchase of any interest. The net profits, receipts from construction, tangible net worth, and the percentage relationships between these items for Barber Brothers Company for the fiscal years ended June 30, 1947, through June 30, 1960, plus the period July 1, 1955, through March 31, 1956, were as follows: Percentof netFiscalReceiptsprofit toyearfromconstructionTangibleendedNet profitconstructionreceiptsnet worth6-30-47$120,870.78$ 728,319.5216.61$ 648,047.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,573.331,259,638.357.83704,083.816-30-49111,591.341,244,049.578.97769,268.506-30-50360,518.492,618,627.7113.771,077,842.896-30-51326,311.672,480,519.1213.151,108,829.956-30-52343,185.663,002,918.3111.431,188,235.076-30-53405,932.392,201,158.1618.451,325,474.816-30-54439,030.694,174,984.8110.521,503,817.366-30-55521,456.484,037,080.0412.921,780,027.453-31-56 1500,621.293,225,825.7515.52921,180.566-30-56500,399.444,013,230.8612.47938,450.256-30-57619,809.325,208,788.2211.901,256,726.026-30-58542,282.474,131,825.6113.211,312,816.876-30-59542,188.785,764,135.239.411,616,339.976-30-60836,746.834,556,865.8918.372,093,554.81*149 PercentPercent ofof netconstructionFiscalprofit toreceipts toyeartangibletangibleCurrentendednet worthnet worthratio6-30-4718.65112.396.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.00178.908.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.50161.7211.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.45242.9538.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.43223.7115.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.88252.7245.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.63166.0716.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.19277.6318.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.29226.8047.063-31-56 154.35350.185.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.25427.646.70:16-30-5749.32414.6710,78:16-30-5841.31314.738.17:16-30-5933.54356.687.36:16-30-6039.97217.6610.21:1The average net profit earned by Barber Brothers Company during the fiscal years ended June 30, 1947, to March 31, 1956 (9 3/4 years) was $331,086.37, and the average percentage of net profit to gross construction receipts during the same period was 12.92 percent. During the fiscal years ended June 30, 1956, to June 30, 1960, the average net profit earned by Barber Brothers Company was $608,285.37 and the average percentage of net profit to gross construction receipts during the same period was 13.05 percent. Barber Brothers*150 Company reported the net profit and losses for income tax purposes resulting from its construction contracts on a completed contract basis and it maintained its books for the most part on an individual job contract system. Approximately 85 percent of the business conducted by Barber Brothers Company during the approximate 10-year period prior to March 31, 1956, consisted of public works construction contracts which had been awarded to it on a competitive bid basis. Under the laws of Louisiana (La. Rev. Stat. of 1950, Tit. 38, § 2211) such contracts were required to be awarded to the lowest financially responsible bidder. The various state agencies from which petitioners obtained contracts consistently followed the practice of awarding contracts to the lowest bidder. As of March 31, 1956, Barber Brothers Company had begun work on 31 contracts. Work on these contracts was begun sometime after July 1, 1954, and all of such contracts were completed by June 30, 1958. The State of Louisiana and its subdivisions followed the practice of estimating the amount of work completed on a particular contract at intervals of 30 days after the work order had been issued. Such estimates were prepared*151 by a project engineer. The estimated amount, less a certain retained percentage, was the basis for the periodic progress payments made to petitioners during the course of construction. Final adjustments were made upon the completion of each contract. The various contracts under which Barber Brothers Company had begun work on or before March 31, 1956, together with the gross receipts and the direct costs incurred on the uncompleted jobs as of that date, and the gross receipts and direct costs resulting from the completion of the 31 contracts in progress as of March 31, 1956, were as follows: Incomplete jobsCompleted jobsMarch 31, 1956May 4, 1956Description of jobReceiptsCostsReceiptsCostsBaton Rouge-Puckett(B)$ 54,479.40$ 44,581.89Geismer-Gonzales(B)3,000.002,977.50Hoo Shoo Too(B)94,625.1170,339.36Howell-Deeerford(B)170,447.61124,463.82Indian Mound-Baywood(B)32,131.2018,610.91Jennirgs(B)36,513.5030,471.88Lafayette-5(B)19,085.9519,081.33Lafayette-5 Private(N)2,891.802,256.22Lafayette-4(B)196,995.90160,042.32$195,875.74$161,427.05Lafayette-4 Private(N)116,211.7970,567.28115,413.1470,567.28Lafayette Drainage(B)30,746.5220,383.9236,692.9523,871.72#6Lafayette-Burk(B)524,639.06422,454.63Lafayette Underpass(B)66,580.6047,435.43Lukeville-Brusly(B)27,613.8626,204.59Maurice-Milton(B)11,283.6411,517.06New Roads-Labarre(B)21,158.7020,820.11Perkins Road(B)26,235.5922,321.70Perkins Road-Private(B)50.0041.46Pinhook Road-Cameron(B)106,311.8397,130.85Pinhook Road-Private(N)7,160.264,845.66Plank Road(S)37,753.3525,640.64Plaquemine Loop(B)30,894.3521,529.06Pollard Estates(N)46,300.0026,688.98Ridge Duson(B)103,989.0787,727.62Riveroaks #3(N)13,428.167,510.23Scotlandville(B)387.86Singer-DeRidder(S)125,595.5499,026.41Singer-DeQuincy(S)104,208.1782,513.24Sunset-Bosco(B)57,506.6048,409.81Surrey Street(B)78,362.3265,521.8034th Street(B)42,268.4540,512.96$2,188,468.33$1,722,016.53$347,981.83$255,866.05Deferred creditMarch 31, 1956466,451.80Gross income from92,115.78jobs$2,188,468.33$2,188,468.33$347,981.83347,981.83*152 (B) Bid; (S) Subcontract; (N) Negotiated. Completed jobsJune 30, 1956Description of jobReceiptsCostsBaton Rouge-Puckett(B)Hoo Shoo Too(B)$ 97,919.85$ 70,339.36Howell-Deerford(B)Indian Mound-Baywood(B)Jennings(B)Lafayette-Burk(B)Lafayette Underpass(B)64,842.3950,286.13Lukeville-Brusly(B)Maurice-Milton(B)Pinhook Road-Cameron(B)Pinhook Road-Private(N)Plank Road(S)Ridge-Duson(B)Riveroaks #3(N)14,856.128,493.80Singer-DeRidder(S)125,987.1099,026.41Singer-DeQuincy(S)Sunset Bosco(B)Surrey Street(B)79,837.3865,506.5534th Street(B)$383,442.84$293,652.25Gross income from jobs89,790.59$383,442.84$383,442.84Completed jobsJune 30, 1957Description of jobReceiptsCostsBaton Rouge-Puckett$ 221,473.44$ 166,054.31Hoo Shoo TooHowell-Deerford261,058.02197,562.05Indian Mound-Baywood56,058.8135,815.70Jennings452,798.38382,993.60Lafayette-Burk651,510.38539,615.01Lafayette UnderpassLukeville-Brusly89,594.6972,537.59Maurice-Milton83,508.1267,085.05Pinhook Road-Cameron104,448.7796,939.10Pinhook Road-Private7,073.264,845.66Plank Road103,787.2973,200.15Ridge-Duson167,977.75134,794.63Riveroaks #3Singer-DeRidderSinger-DeQuincy104,853.4084,600.42Sunset Bosco227,819.51177,187.91Surrey Street34th Street185,646.09136,043.43$2,717,607.91$2,169,274.61Gross income from jobs548,333.30$2,717,607.91$2,717,607.91*153 Completed jobsJune 30, 1958Description of jobReceiptsCostsGeismer-Gonzales(B)$ 303,324.68$ 239,693.45Lafayette-5(B)333,883.24273,197.05Lafayette-5 Private(N)87,277.2361,846.06New Roads-Labarre(B)312,226.65243,487.69Perkins Road(B)79,964.1960,074.23Perkins Road-Private(B)50.0041.46Plaquemine Loop(B)311,130.79191,814.15Pollard Estates(N)259,701.66143,650.50Scotlandville(B)228,565.70171,617.57$1,916,124.14$1,385,422.16Gross income from jobs530,701.98$1,916,124.14$1,916,124.14(B) Bid; (S) Subcontract; (N) Negotiated. The expected future gross receipts on the incompleted contracts on which work was being performed by Barber Brothers Company on March 31, 1956, totaled $5,365,157. Of this amount, $4,546,207 (84.7 percent thereof) represented the anticipated future gross receipts on prime contracts which had been awarded Barber Brothers Company on public works projects on a competitive bid basis. The expected future gross receipts on subcontracts in progress which had been awarded Barber Brothers Company on a competitive bid basis amounted to $334,628, *154 or approximately 6 percent of the expected future receipts. Nine percent of the total anticipated future gross receipts on contracts on work in progress on March 31, 1956, or $484,318, consisted of income from private contracts that had been negotiated by the partners. During the years 1950 through 1960, Barber Brothers Company bid on jobs and was awarded contracts by placing low bids in total dollar amounts as follows: Total numberTotal numberTotal amount ofCalendarof jobsof contractsBarber Bros. Co.'syearbid onawardedlow bids1950339$1,585,629.5019512281,978,783.7419522861,865,967.641953366896,924.1419542791,224,556.97195555173,108,269.191956174522,243.5819573392,901,051.0619582871,898,050.65195932112,373,929.97196026102,118,887.83By notarized instruments executed May 4, 1956, and by their terms made effective as of March 31, 1956, the five above-mentioned partners of Barber Brothers Company and their spouses donated undivided limited or commendam interests in the partnership as follows: Robert T. Barber and LaRue Frye Barber, his wife, together*155 donated a 5 percent interest to Anna Barber Guilotte, and a 5 percent interest to Sue Barber Cook. Harry W. Barber and Augusta Taylor Barber, his wife, together donated a 6 percent interest to Harry W. Barber, Jr. Aubrey Lee Barber and Anna Laura Guillory Barber, his wife, together donated a 2 percent interest to Paul T. Barber, a 2 percent interest to Lionel Hilliard Barber, and a 2 percent interest to Aubrey Lee Barber, Jr. Louis P. Barber and Cleta Monica Bailey Barber, his wife, together donated a 1 percent interest to Cleta Monica Barber and a 1 percent interest to Mary Josephine Barber. Frank Allen Barber and Chris Suarez Barber, his wife, together donated a 3 percent interest to Jenny Barber Witty. The recipients of the partnership interests acquired the right both to a share of the profits already earned from the donors' partially completed contracts as of March 31, 1956, and the right to a proportionate interest in any future profits realized upon the complete performance of the contracts. Petitioners have conducted their contracting operations throughout the State of Louisiana since 1928, and have maintained their principal place of business and their personal*156 residences the City of Baton Rouge, Louisiana, since that time. During the period 1928 to 1956, the Barber brothers, through their various corporate and partnership interests, have developed an excellent reputation as contractors, particularly in the Baton Rouge area. During this period of 28 years, there has been no significant change in the location, management, area of operation, name, or type of business carried on by the Barber brothers. During the period of approximately 28 years prior to March 31, 1956, the five Barber brothers contributed their full-time services to their construction enterprises and each one was responsible for a certain phase of the business. None of them regularly supervised the actual construction work on the job sites. Petitioners normally employed six construction superintendents to supervise the work in the field. The respondent determined that the fair market value of Barber Brothers Company as of March 31, 1956, was $2,500,000. Ultimate Findings Barber Brothers Company had goodwill in the amount of $89,147 * as of March 31, 1956. *157 The fair market value of the incompleted construction contracts owned and in progress on March 31, 1956, was $500,417.32 ** . The fair market value of Barber Brothers Company on March 31, 1956, was $1,510,744.88 *** . Opinion The sole question presented by the parties is the fair market value for gift tax purposes of the Barber Brothers Company partnership on March 31, 1956. Section 2512(a) of the Internal Revenue Code of 1954 provides: SEC. 2512. VALUATION OF GIFTS. (a) If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. The respondent's regulations state that in determining the fair market value of any interest in a business: net value is determined on the basis of all relevant factors including - (1) A fair appraisal as of the date of the gift of all the assets of the business, tangible and intangible, including good will; (2) The demonstrated earning capacity of the business * * * [Sec. 25.2512-3, Income Tax Regs.*158 ] The parties agree on brief that the value of the partnership on March 31, 1956, was not less than $921,180.56, representing the fair market value of the tangible * assets of the business. The petitioners contend that the value of the partnership as of March 31, 1956, was not more than the value of the tangible assets, or $921,180.56, and that no value should be placed on any intangible which the partnership may have owned. The respondent claims, however, that the fair market value of Barber Brothers Company as of the date of the transfer by way of gift of the interests of the partners was $2,500,000. This amount was arrived at in the following manner: To the value of the tangible assets of the business ($921,180.56) the respondent has added $466,451.80, representing the gross profit as of March 31, 1956, on the 31 construction contracts then in process of completion by Barber Brothers Company. 3 The total of the two foregoing amounts, or $1,387,632.56, is claimed by respondent to represent the value of the "tangible*159 assets" of the partnership, despite the fact that $466,451.80 thereof represents gross profit derived from work in process. The computation of the total fair market value of Barber Brothers Company, as determined by respondent, may be summarized as follows: Value of "tangible$1,387,632.36assets"Value of goodwill598,833.74Value of work in process513,533.90Total fair market value$2,500,000.00The petitioners first contend that Barber Brothers Company had no goodwill whatsoever because of the fact that the greater portion of their business was derived from public works contracts awarded on a competitive bid basis. The respondent has determined that petitioners owned goodwill in the amount of $598,833.74 on March 31, 1956. This amount was computed on a basis of less than twice (1.9 * ) the average net profit earned by Barber Brothers Company during the period of approximately 10 years prior to the date*160 of the donations here involved ($312,795.16 ** ). The construction work in which petitioners were engaged consisted chiefly of paving, road building, and heavy construction work for the State of Louisiana, its subdivisions, corporations, municipalities, and other public agencies. The public contracting agencies through which petitioners' public works contracts were procured consistently followed the practice of awarding such contracts to the lowest responsible bidder, as is required by the statutes of Louisiana. 4*161 The record discloses the experience of petitioners to have been that 85 to 90 percent of the total business of Barber Brothers Company consisted of such public work contracts. Petitioners correctly contend that where the earning power of a business depends upon an asset, business advantage, or source of patronage which the owners of the business are unable to convey to a purchaser thereof, such as the personal skill of the owner, a nonassignable franchise, an unusual consumer demand for the product of the business, or a captive market which a sale of the business would itself destroy, no marketable goodwill exists. Charles F. Coates, 7 T.C. 125; Danco Co., 14 T.C. 276; Floyd D. Akers, 6 T.C. 693; Donal A. Carty, 38 T.C. 46. The recognition of goodwill for tax purposes requires a transferable expectancy of continued earnings in excess of a fair return on the tangible assets of the business. Estate of A. Bluestein, 15 T.C. 770; Donal A. Carty, supra. In the instant case, as noted above, petitioners did not obtain the bulk of their business from the patronage of the general public. Their principal*162 customer was the State of Louisiana, its agencies, and subdivisions. The business obtained by them on road construction and public works projects accounted for at least 85 percent of their partnership income and was procured through the submission of the lowest competitive bids. Petitioners could not depend upon the patronage of any customer, for it appears that none were habitual patrons or the source of recurring business. If, as appears to have been the case, petitioners' earning power was dependent upon their skill in preparing low cost estimates and in successful competitive public bidding, this is an attribute which attaches to the personal qualifications and professional skill of the owner and is not a basis for the recognition of goodwill. Cf. D. K. MacDonald, 3 T.C. 720. Since petitioners' contracts obtained through low competitive public bids were the major source of their earnings, and since no expectation of the patronage of the State of Louisiana, or its agencies and subdivisions, could have been conveyed by them to a purchaser of their partnership business, it is clear that to the extent their earnings were dependent upon such contracts they did not own*163 goodwill recognizable for tax purposes. However, the record discloses facts indicating that petitioners did own a measure of goodwill on March 31, 1956. The testimony of Lee E. Toney, Jr., accountant for Barber Brothers Company, shows that 10 to 15 percent of its earnings were derived from negotiated private contracts. On March 31, 1956, petitioners anticipated future receipts in the amount of $484,318 from private contracts then in process. This amount represented 9 percent of the total anticipated future receipts in the amount of $5,365,157 to be derived from all 31 contracts in process on March 31, 1956. Further, it is clear that Barber Brothers Company was a well established firm. The petitioners, operating under the same name or very similar names, had been engaged in the contracting business in the City of Baton Rouge, Louisiana, for approximately 28 years. They were financially responsible and had acquired an excellent reputation in the contracting field, particularly in the Baton Rouge area. Their earnings record, showing an average net profit of $312,795.16 * per year for the period of approximately 10 years prior to March 31, 1956, was excellent. Further, for all but*164 2 of the 28 years during which they were engaged in the contracting business, they realized a substantial profit. Under such circumstances we think that, to the extent petitioners' earnings were derived from private contracts, they possessed goodwill on March 31, 1956, which must be recognized. Petitioners have not questioned the method employed by the respondent in computing the goodwill attributable to Barber Brothers Company at the time of the gift of their partnership interests, assuming they then owned any recognizable goodwill. As previously noted, the respondent's method assumes that the goodwill of the partnership was worth 1.9 ** times petitioners' average annual earnings for the 9 3/4 year period prior to March 31, 1956. This method of valuation is equivalent to capitalizing petitioners' average net earnings at the rate of approximately 52 *** percent. To the extent indicated above, we think this method is reasonable and should be applied here. Cf. Sidney V. LeVine, 24 T.C. 147; John Q. Shunk, 10 T.C. 293, reversed*165 on other grounds, 173 F. 2d 747. Fifteen percent of the average earnings of the partners for the 9 3/4 year period preceding the transactions in question is $46,919.27 * which, if projected over a period of 1.9 ** years, yields a value for goodwill in the amount of $89,147 ** , and we hold that petitioners owned recognizable goodwill in that amount on March 31, 1956. The respondent has further determined that petitioners' work in process at the time of the gifts of their partnership interests had a value of $513,533.90, representing the total net profits to be realized therefrom, and that the net worth of Barber Brothers Company as of March 31, 1956, should be increased by that amount. Petitioners contend that the 31 construction contracts owned by them and in process of completion on March 31, 1956, were incapable of valuation on that date and that it is*166 improper to include in the value of their partnership interests anything representing work in process. We are unable to agree with petitioners' contention. Although it is true, as petitioners point out, that for purposes of income tax reporting they have elected to utilize the completed contract method of accounting pursuant to the provisions of the respondent's regulations (Sec. 1.451-3(2), Income Tax Regs.) which allow them to defer the reporting of income from a construction contract until the job is finally completed and the exact net profit is ascertainable, this by no means establishes that prior to completion, the work in process had no ascertainable fair market value for gift tax purposes. The bids submitted by petitioners on public works contracts were obviously intended to produce for them a profit upon completion of the job. That they were generally able to realize a substantial profit on the contracts awarded them is borne out by their excellent earning record over a period of approximately 28 years. Further, the record shows that on jobs undertaken for the State of Louisiana or its subdivisions, interim payments were made to them periodically*167 on the basis of estimates prepared by a project engineer employed by the State. It was the practice of the State of Louisiana to withhold from the total payment, based upon the project engineer's estimated percentage of completion, a percentage thereof until final adjustments were made upon completion of the job. Petitioners' records show that at the time the donations of their interests in Barber Brothers Company were made, the 31 construction contracts then owned by them were approximately 42 percent completed. The books of the partnership also disclose that as of March 31, 1956, petitioners had received total progress payments on the 31 contracts in process in the amount of $2,188,468.33, and had incurred direct costs on the jobs in process amounting to $1,722,016.53, leaving a gross profit on that date of $466,451.80. In view of the foregoing, we think that the costs to be incurred in the course of the satisfactory performance of the contracts in question were sufficiently definite as of March 31, 1956, and the income to be derived therefrom was sufficiently predictable, that it was readily possible to arrive at a reasonable approximation on that date of the net profit to be*168 realized from the complete performance thereof. Petitioners contend in the alternative that if any amount representing the value of work in process is to be included in the net worth of the partnership, the amount should be limited to the profits actually earned as of the effective date of the gifts. However, the facts presented here show that the gifts of the partnership interests transferred to the donees both the right to a share of the profits earned from the partially completed contracts on the date of the donation and the right to a proportionate interest in any future profits realized upon completion of the projects being performed by the donor-partners. Consequently, we are of the opinion that the fair market value of the jobs in process on March 31, 1956, should be determined on the basis of the total net profits which the partners foreseeably could have been expected to realize upon the completion of the work. The respondent's method of valuation of the 31 jobs in process on March 31, 1956, is based upon the average net profit of Barber Brothers Company for the approximate 10-year period prior to March 31, 1956, as compared with its total construction receipts for the*169 same 10-year period. The record discloses that petitioners' net profit averaged 12.59 * percent of total construction receipts during the period of 9 3/4 years prior to the donations of their interests in the business. Applying the same percentage of profit to the total anticipated receipts to be derived from 31 contracts in process on March 31, 1956, viz., $3,974,720.58, 5 the total net profit expected to be realized from such construction contracts would be $500,417.32 ** . The net profit computations for which petitioners contend are based upon various accounting methods for the allocation of overhead expenses, arriving at amounts representing total net profit ultimately to be realized from jobs on hand which vary from $360,374 to $475,865. 6*170 The method utilized by the respondent takes into account the actual net profit experience of the petitioners, including, of course, their indirect costs. We believe this method to be more realistic and reliable than the application of any of the cost accounting methods suggested by petitioners, particularly since the record fails to show any change in their business practice or method of operation during the approximate 10-year period prior to March 31, 1956. The lack of reliability of the cost accounting methods utilized by petitioners is demonstrated by the fact that the anticipated net profit is caused to vary by as much as $115,491. We cannot believe that on March 31, 1956, there would have been a foreseeable difference of $115,491 in the amount of net profit to be realized on these contracts. We therefore are of the opinion that the value of Barber Brothers Company work in process on March 31, 1956, amounted to $500,417.32 * . In so holding, we reject one aspect of the respondent's computation, viz., the inclusion under the heading of the "tangible*171 assets" of the partnership of the $466,451.80 amount representing the gross profit realized from the partially completed contracts as of March 31, 1956. We are unable to see any justification for including in the value of the Barber Brothers Company business both the gross profit received from the jobs in process as of March 31, 1956 ($466,451.80), and the total anticipated net profit to be derived from the completion of the entire 31 projects (i.e., $500,417.32 *). The latter amount alone represents the amount which the petitioners at the time of the gifts in question realistically could have expected to realize from the work in process, and the amount by which the net worth of the partnership should be increased. For the above-stated reasons, we hold that the fair market value of Barber Brothers Company on March 31, 1956, was $1,510,744.88 ** , consisting of tangible assets of an agreed value of $921,180.56, goodwill in the amount of $89,147 *** , and work in process having a value of $500,417.32 *. Decisions will be entered*172 under Rule 50. Footnotes1. Proceedings of the following petitioners are consolidated herewith: LaRue Frye Barber, Docket No. 84476; Frank A. Barber, Docket No. 84477; Chris Suarez Barber, Docket No. 84478; Harry W. Barber, Docket No. 84479; Augusta T. Barber, Docket No. 84480; Aubrey L. Barber, Docket No. 84481; and Anna Laura Gullory Barber, Docket No. 84482.↩2. The stock ownership of Barber Brothers Construction Company, Inc., is not disclosed by the record.↩1. Nine-month period.↩*. By official order of the Tax Court dated Nov. 1, 1963 and signed by Judge Withey↩, this figure was substituted for $89,393.**. This figure was substituted for $513,533.90 by Tax Court order 11/1/63.↩***. By Tax Court order 11/1/63 this figure was substituted for $1,524,027.46.↩*. By official order of the Tax Court, dated 11/1/63 and signed by Judge Withey↩, the word "tangible" was substituted for the word "intangible".3. The amount of gross profit ($466,451.80) was computed by subtracting the direct costs incurred on the 31 jobs in process from the progress payments received by petitioners as of March 31, 1956. No allowance was made for overhead or indirect costs.↩*. This figure was substituted for 1.8 by Tax Court order 11/1/63. ↩**. By Tax Court order 11/1/63 this figure was substituted for $331,086.37.↩4. Section 2211, Louisiana Revised Statutes of 1950, Title 38, provides: § 2211. Advertisement and letting to lowest responsible bidder All public work to be done, exceeding the sum of one thousand dollars, by any public corporation or political subdivision of the state or for the purchase of materials or supplies to be paid out of public funds shall be advertised and let by contract to the lowest responsible bidder who has bid according to the contract, plans, and specifications as advertised. The advertisement shall be published once a week for three different weeks, the first advertisement to appear at least fifteen days before the opening of bids.↩*. By official order of the Tax Court, dated 11/1/63 and signed by Judge Withey↩, this figure was substituted for $331,086.37.**. By Tax Court order 11/1/63 this figure was substituted for 1.8. ↩***. This figure was substituted for 55 by Tax Court order 11/1/63. ↩*. By Tax Court order 11/1/63 this figure was substituted for $49,650. ↩**. This figure was substituted for $89,393 by Tax Court order 11/1/63.↩*. By Tax Court order 11/1/63 this figure was substituted for 12.92. ↩5. Consisting of bid prices on 16 jobs with the Louisiana Highway Department totaling $3,293,795.29, plus the actual receipts as of March 31, 1956, on 15 jobs totaling $680,925.29. ↩**. This figure was substituted for $513,533.90 by Tax Court order 11/1/63.↩6. The three methods of allocation of the overhead costs attributable to the jobs in process which were utilized by petitioners on brief were: (1) Based upon the income derived from contracts completed during the period April 1, 1956, to June 30, 1956, and the fiscal years ended June 30, 1957, and June 30, 1958. (2) Based upon the direct costs incurred on contracts completed during the period April 1, 1956, to June 30, 1956, and the fiscal years ended June 30, 1957, and June 30, 1958. (3) Based upon the direct costs incurred on work performed during the fiscal years ended June 30, 1955, to June 30, 1958, without regard to the contracts completed.↩*. By official order of the Tax Court, dated 11/1/63 and signed by Judge Withey↩, this figure was substituted for $513,533.90.**. This figure was substituted for $1,524,027.46 by Tax Court order 11/1/63. ↩***. By Tax Court order 11/1/63 this figure was substituted for $89,393.↩