Frank J. Longo, et al. [1] v. Commissioner. Longo v. Commissioner
Docket Nos. 339-66 - 341-66.
United States Tax Court
T.C. Memo 1968-217; 1968 Tax Ct. Memo LEXIS 82; 27 T.C.M. (CCH) 1075; T.C.M. (RIA) 68217; September 26, 1968. Filed John E. Glover, for the petitioners in docket No. 339-66. Kenneth J. Murphy, Jr., 6435 Wilshire Blvd., Los Angeles, Calif., for the petitioners in docket Nos. 340-66, 341-66. Richard L. Fishman, *83 for the respondent. 1076 FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: In these consolidated cases respondent has determined a deficiency in Callanan-Clark & Longo, Inc.'s, (hereinafter sometimes referred to as petitioner corporation or the corporation) income taxes for the taxable year March 1 to August 6, 1962, in the net amount of $5,864.18. [2]
Respondent further determined that petitioners James F. Callanan and Frank J. Longo are liable, as transferees of Callanan-Clark & Longo's assets, determining transfers in the amounts of $5,864.18 and $3,800, respectively. Respondent now concedes that only $2,062.41 was transferred to Frank Longo. The issues for determination are: 1. Whether the corporation suffered a deductible $20,000 loss of goodwill upon its dissolution and if not, 2. The extent of the liability of the individual petitioners as transferees of the corporation's assets. Our determination of the first issue also will determine the allowable amount of charitable contributions deductible by petitioner *84 corporation. Findings of Fact Some of the facts are stipulated and are so found. At the time the petitions in this case were filed, the individual petitioners, James F. Callanan (hereinafter sometimes referred to as Callanan) and Frank J. Longo (hereinafter sometimes referred to as Longo) resided in Los Angeles, California. The corporate petitioner has been dissolved since August 6, 1962, but had a legal existence for purposes of the instant proceeding in Los Angeles, California. For the fiscal year ending August 6, 1962, the corporation timely filed its corporate income tax return on an accrual method of accounting with the district director of internal revenue, Los Angeles, California. In 1961 James Callanan and Henry Clark were equal partners in the Callanan-Clark Insurance Agency. The agency handled primarily automobile and casualty insurance, 95 percent of which was brought in through Callanan's personal contacts in his funeral directing business, coaching and Naval Reserve activities. While Callanan brought in the clients, Clark serviced the accounts, devoting 100 percent of his time to the agency. Callanan, who spent most of his time managing his funeral directing business, *85 devoted no more than 10 percent of his time to agency business. The agency also engaged a third man, Jack McLaughlin, who helped Clark service accounts. In addition to servicing its own clients, Callanan-Clark entered into management partnerships with various other insurance agencies for the purpose of managing the business of those agencies. One of the agencies with which such an arrangement was made was the Longo & Roach Insurance Agency, in which petitioner Frank J. Longo was a partner. Callanan-Clark managed Longo's agency from April 1, 1960 until the formation of petitioner corporation. Other agencies managed by Callanan-Clark at the time petitioner corporation was formed were: Insurance Specialists, managed since September 1, 1960, and Henricksen Insurance Agency, managed since January 1, 1961. During 1961 Callanan-Clark, through a miscalculation of its cash flow, found itself with an immediate need for $20,000. Longo had been interested in merging his agency with Callanan-Clark and was willing to pay the cash which Callanan needed in return for the merger. Callanan originally wanted $30,000 from Longo as payment for the difference between the value of the business he would *86 bring into a merged operation, as compared with that which would be supplied by Longo. He finally agreed to accept $20,000. The payment of $20,000 by Longo to Callanan was consummated when Longo borrowed $20,000 and paid that amount to the Callanan-Clark Agency. The money was then used by the agency to pay its existing obligations. Callanan-Clark recorded the receipt of the $20,000 as follows: 2/28/61 Security First Nat'l Trust Act.
$20,000.00
Suspense
$20,000.00
To record deposit of 2/8/61
The credit was made to "suspense" rather than to a specific asset because at the time the amount was received, Callanan-Clark's accountant, Frank L. Bryant, was uncertain as to the nature of the assets which were 1077 being conveyed from the partnership to Longo. Bryant assumed that the payment was for the overall goodwill which the partnership had built up, but wanted the amount attributed to an asset which possibly could be depreciated for income tax purposes. He eventually decided, with the approval of Callanan and Longo, that the payment should be treated as proceeds from the sale of the customer list of the Callanan-Clark Agency in hopes that the list would be *87 subject to depreciation. At the time the $20,000 was received, Callanan-Clark's commissions from its policyholders, excluding those from the management partnership, were approximately $30,000 per annum. On its partnership Federal income tax return for the fiscal year ending December 31, 1961, Callanan-Clark reflected the receipt of the $20,000 on Schedule D as long-term capital gain from the proceeds of the sale of a capital asset "Customer List." One-half of the net capital gain from Schedule D was reported by Callanan on his joint income tax return for 1961 and the other half was reported by Clark on his return. On February 8, 1961, James Callanan and Frank Longo entered into an agreement to form the corporate petitioner, Callanan-Clark and Longo. Under the terms of the agreement each party contributed all the assets of his respective insurance agency to the corporation. Each party also contributed $500, for which each received five shares of $100 par value common stock. This stock constituted the only issued and outstanding stock of the corporation during its existence. The purpose of the corporation was to sell insurance and conduct a bonding business of all kinds and classes, *88 with the exception of bail bonds. Upon incorporation of petitioner corporation and the transfer of its assets thereto, the partnership of Callanan & Clark terminated. Shortly after the formation of petitioner corporation, Callanan and Longo decided that the corporation would assume the $20,000 liability incurred by Longo (to pay the $20,000 cash to Callanan-Clark). On March 13, 1961, petitioner corporation executed a promissory note for $20,000, endorsed by Longo and Callanan in favor of the Bank of America, and used the proceeds to satisfy Longo's $20,000 obligation. This transaction represented a purchase by the corporation of the asset sold to Longo by Callanan, or as stated by respondent in his proposed finding of fact, "The payment by the corporation was for the customer list of the partnership." On its books and records, petitioner corporation set up a ledger card entitled "Customer List" which card contained the following entry: Date
Reference
Charges
Credits
Balance
11/30/61
JE-1
$20,000.00
$20,000.00
The corporation also set up a ledger card entitled "Note Payable - Bank of America," which card shows $20,000 as a credit as of 11/30/61. *89 The operation of petitioner corporation was substantially similar to that of the Callanan-Clark Agency. Henry Clark was not a shareholder in the corporation, but remained as an employee under a verbal contract as general manager. His responsibilities included allocating work, maintaining existing accounts and working with new leads. Jack McLaughlin also remained in the new organization. He handled the old Roach and Longo accounts along with new accounts attributable to Longo. Previously he had serviced the Roach and Longo accounts under the management contract with the Longo & Roach Agency. The management contracts which Callanan-Clark had, other than the Longo & Roach Agency agreement, were assumed by the corporation after being renegotiated and rewritten. Petitioner corporation's operation shortly proved to be an undesirable venture from the point of view of Callanan and Longo, and on April 26, 1962, they entered into an agreement providing for its dissolution. This agreement called for each of them to assume the corporation's assets and obligations in equal proportion. It also provided that each would receive a customer list of those clients which he had developed originally, *90 and further provided that for a period of six years neither would accept and each would refuse to write insurance for any person whose name appeared on the list assigned to the other. The relevant provisions read as follows: 4. Assignment of Accounts. A list of the clients of the corporation for whom insurance business has been placed and is currently in force is attached hereto, marked Exhibit "A" and is incorporated herein by this reference. The said listing of clients is divided between those which were originally or primarily produced by Frank J. Longo and those which were 1078 originally or primarily produced by James F. Callanan, or his prior insurance firm. The parties do hereby assign and set over, each to the other, all future business rights in and to the respective accounts as designated and specified in Exhibit "A." This is intended to accomplish a division of the customer list of the corporation so that each may hereafter conduct a separate insurance business with the specified clients being the clients of each party's respective separate insurance business. Each party agrees to be solely responsible for servicing the accounts hereby assigned to him and to be solely *91 responsible for any return commission or other obligation which may arise by reason of the cancellation, loss or other liability arising from the broker-client relationships, to the same extent as though he had written said business in his separate general insurance agency rather than in the corporation being dissolved. * * * 10. Agreements Regarding Clients. It is the intention and desire of the parties to each see that the other maintains the best possible client relations with the accounts being assigned to him, respectively as herein provided. To this end, and in view of the fact that Frank J. Longo will retain the present telephone listing of the agency, he agrees to instruct the personnel in his office to refer calls which come in and pertain to accounts assigned to James F. Callanan to the office of the latter party. In consideration of the mutual covenants contained herein and the division of the firm's customer list between the parties, each agrees that for a period of six (6) years commencing with the date of this Agreement, he will decline and refuse to accept or write insurance for any person listed on Exhibit "A" and whose insurance business is hereby assigned to the *92 other party. 11. Notices. The parties agree to coincide the date of sending notices to their respective clients with regard to the dissolution of the present agency business and each agrees not to make prior notices to the detriment of the other. The parties also agree that appropriate notices will be sent to the insurance companies involved indicating the transfer of the accounts as specified herein and indicating the party to be hereafter responsible on the respective policies. These notices will also be sent concurrently and at a time mutually agreeable to the parties. With regard to any contingency benefits on policies written through the corporation, it is agreed that any excess commissions earned thereon will be divided equally between the parties hereto, A subsequent agreement amended paragraph 4 to provide that if a client appeared on the wrong list the account and commissions would be assigned to the proper party. The above agreement not to compete between Callanan and Longo was the only restriction placed on Callanan's right to use the respective lists. There was no agreement not to compete between petitioner corporation and Callanan. Neither was there such an agreement *93 between petitioner corporation and Henry Clark, nor is there evidence in the record that either Frank Longo or Jack McLaughlin entered into any such agreement with petitioner corporation. Pursuant to the agreement of dissolution, Callanan and Longo each received tangible physical assets worth $2,062.41, and the customer lists referred to above. On May 4, 1962, Callanan, Henry Clark and Jack McLaughlin incorporated a new corporation called Callanan-Clark & McLaughlin, Inc., for the purpose of conducting a general insurance business. For the period May 1, 1962, through and including August 31, 1962, the new corporation earned total commissions of $11,096.48. This total was from 502 invoice billings, of which 427 invoices, totaling $8,643.52, were sent to people whose names appeared on the list assigned to Callanan by paragraph 4 of the agreement to dissolve petitioner corporation. At the time petitioner corporation was dissolved, the customer list in Callanan and Clark's hands was expected to produce $20,000 annually in insurance commissions. Though the accounts which Callanan took from petitioner corporation upon its dissolution were profitable to his new corporation, the list *94 of accounts had no fair market value when it was transferred to Callanan from petitioner corporation. The policies obtained from the clients were generally the result of the personal efforts of Callanan. Most accounts were automobile policies which provided coverage for one year. The rest were mostly fire and property coverage policies which provided coverage for three years. About 40 percent of the policies covered license to Ar-Tik. 1264 private individuals. There was no right of the petitioner corporation to demand that an insured continue his policy with it at any time. Even the three-year policies could be canceled by the insured at any time with a minor penalty. A list of clients similar to those of the corporate petitioner, obtained through 1079 personal contacts, has no fair market value unless those individuals who generated the business (obtained the policies) sign a covenant not to compete. Without such a covenant, there is a great risk that those originally responsible for obtaining the clients will be able to regain the clients at the expense of the purchaser. In some instances, where there is no covenant, a buyer will take the list on a contingency basis, *95 paying a commission to the seller only when premiums are collected. This is called a "gonna" deal. However, in the absence of a covenant not to compete, the risk that the seller will regain the accounts is so great that there is no cash value attaching to the list itself. In recording the dissolution of the corporation on its books and records, petitioner corporation wrote off the asset which it had purchased for $20,000 as worthless by making the following entry on the ledger card entitled "Customer List": Date
Refer- ence
Charges
Credits
Balance
9-30-62
JE-23
$20,000.00
0
As a closing journal entry under the date of September 30, 1962, the corporation made the following entry accompanied by the following explanation: Operating expenses-Customer lists
$20,000.00
Customer Lists
$20,000.00 To write off customer lists which were purchased from Callanan and Clark March 1, 1961, for $20,000.00. When corporation was dissolved the customer lists were transferred to Callanan-Clark & McLaughlin, Inc. Though the entry is dated September 30, 1962, the customer list was distributed to the new corporation prior to August 6, 1962. *96 On petitioner corporation's final income tax return filed for the fiscal period beginning March 1, 1962, and ending August 6, 1962, the date of dissolution, it deducted the $20,000 cost of the customer list from gross income as an expense. In his statutory notice of a deficiency, respondent disallowed the $20,000 deduction and made other adjustments as follows: EXPLANATION OF ADJUSTMENTS (a) The deduction of $20,000 claimed as an abandonment of a customers list and/or goodwill is disallowed because you have not established that you are entitled to such a deduction. (b) As a result of adjustment (a) above, the total amount of contributions paid during the year, $462.00 is allowable. The adjustment is computed as follows: Taxable income before con- tributions as revised $23,703.80
Limitation on contributions de- duction - 5% $ 1,185.19
Contributions paid-per return
$ 462.00
Contributions deduction per re- turn 185.19
Adjustment-additional deduction
$ 276.81
In his statutory notices to the individual petitioners respondent determined both Callanan and Longo liable as transferees of petitioner corporation's property. Respondent determined that Longo *97 was liable only for the value the physical assets received, now conceded to be $2,062.41. He determined that Callanan was liable for the full amount of the deficiency determined, determining that he had received assets in excess of the deficiency determined for the corporation. Ultimate Finding of Fact At the time of petitioner corporation's dissolution, the intangible which cost it $20,000 was worthless in its hands and at that time it suffered a loss of $20,000. Opinion As partial consideration for merging its insurance agency (Callanan-Clark) with that of Frank Longo (Longo & Roach Insurance Agency), Callanan-Clark received $20,000 from Longo. This amount represented the agreed upon difference in the going concern value between Callanan's agency and Longo's agency. Longo had borrowed the $20,000 to pay Callanan-Clark this amount. Shortly thereafter he and Callanan incorporated petitioner (Callanan, Clark & Longo, Inc.), and the corporation assumed Longo's indebtedness. The parties agree, and we have found, that at the time the corporation assumed this liability, it had purchased a valuable intangible asset from Longo. Its tax basis was $20,000. [3]
*98 1080 On its books and records, petitioner corporation recorded this amount as payment for a customer list which Callanan had brought into the corporation. Subsequently when the corporation liquidated, petitioner corporation deducted $20,000 on its final return as an ordinary loss from the abandonment of goodwill. Though the Commissioner does not necessarily agree that the $20,000 payment was for goodwill, it is his position that whatever was purchased for $20,000, it was neither abandoned nor worthless at any time prior to, or at liquidation. He points out that both prior to the incorporation of petitioner and subsequent to its liquidation, James Callanan, Henry Clark and Jack McLaughlin were operating a general insurance agency with substantially the same customers. He concludes from this fact that whatever it was that Callanan brought into the corporation which was worth $20,000, he took that same asset out and at all times the asset was worth $20,000. Consequently, he contends that there was a distribution of an asset upon the corporation's liquidation, not an abandonment of it. Respondent thus disallowed the $20,000 deduction taken by petitioner corporation. In addition *99 he determined that, under section 6901 of the Code, James Callanan, as transferee of the $20,000 intangible, plus tangible assets worth $2,062.41, is liable for the full amount of the $5,864.18 net deficiency determined for the corporation. Longo also contributed a customer list to petitioner corporation and other intangible assets, which assets were returned to him upon petitioner corporation's liquidation. However, respondent concedes that in Longo's case the intangibles had no value at the time petitioner corporation was liquidated and has consequently determined that Longo is liable as transferee only to the extent of the value of the tangible physical assets he received - $2,062.41. In the instant case, we cannot accept respondent's rationale that the corporation had intangible assets with a fair market value which it could distribute in the liquidation process. The evidence presented established that the $20,000 represented goodwill brought into the corporation by Callanan, (through Longo) which goodwill was attributable to the personal efforts of the members of the old Callanan-Clark organization, namely James Callanan and Henry Clark. It also established that the goodwill *100 had value only so long as those men remained with the company. With Callanan and Clark in the organization, the corporation was a beneficiary of the goodwill which these men had previously established individually with the various policy-holders and agencies with which they were connected. It was worth $20,000 to the corporation to have the use of the goodwill for the indefinite period of time for which Callanan and Clark would be a part of the corporation's operation. What is critical to the instant case is the complete dependence of the corporation on Callanan and Clark for retaining the goodwill which it purchased. Petitioner corporation's clients were realistically the clients of the corporation in name only. The clients identified themselves with the individuals who sold and serviced their policies, not the corporation. Because of this personal identification, Callanan and Clark had the power to take away substantially all the business for which they were responsible in the event they left the corporation. In effect the corporate goodwill blossomed intact only so long as they remained rooted in the corporate garden. When they left the firm they did not receive any goodwill from *101 the corporation, as all of the goodwill of the corporation emanated through, and was permanently attached to, them. As pointed out in the findings of fact, there is no salable goodwill where the business of a corporation is thus so dependent upon its personnel, unless these key employees enter into a covenant not to compete with the corporation. In the instant case no covenant not to compete was entered into by either Callanan or Clark, the ones responsible for the bulk of the business represented by the $20,000 payment. Charles R. Davis, an individual who has negotiated the purchase of numerous insurance agencies testified as an expert witness that the best offer which he would have made for a business similar to petitioner corporation's (in the absence of a covenant not to compete from the key personnel) was the so-called "gonna" deal referred to in the findings of fact. However, even the "gonna" deal has no ascertainable fair market value. The situation in the instant case is identical to, and controlled by our opinion in D.K. MacDonald, 3 T.C. 720 (1944). In MacDonald the taxpayer and his 1081 wife were the sole shareholders in an incorporated insurance agency. *102 They subsequently liquidated the corporation, distributing all assets to the husband, who proceeded to set up an insurance agency under a name similar to the name of the liquidated corporation and solicited the clients of the corporation. The issue presented to us in that case was whether there was any valuable goodwill passing from the corporation to the taxpayers upon liquidation of the corporation. The corporation had no exclusive right to the business of any policyholder, and without a covenant not to compete from the taxpayer, the business of the corporation had no market value, fair or otherwise. In holding that there was no goodwill passing to the taxpayers because the goodwill was solely attributable to the personal abilities of the taxpayers, we stated (pp. 727-728): The facts in the instant cases established that any value which this business may have had on July 31, 1941, in addition to its tangible assets, was due to the personal ability, business acquaintanceship, and other individualistic qualities of D. K. MacDonald. As one witness put it, "Mr. MacDonald was the company." The policy of the corporation was decided by D. K. MacDonald and all employees worked under *103 his direction and supervision. There existed no contract between the corporation and any of its employees, including D. K. MacDonald, with respect to future services. Neither the name of the corporation, its location, its agency agreements, nor its existing policies with customers had any value. If the law prevents the recognition of the personal ability and personality of D. K. MacDonald as an element of this corporation's good will for income tax purposes, then petitioners did not receive any good will as a result of their acquisition of this corporation's assets. We find no authority which holds that an individual's personal ability is part of the assets of a corporation by which he is employed where, as in the instant cases, the corporation does not have a right by contract or otherwise to the future services of that individual. The contrary seems to be indicated by such cases as Cox v. Helvering, 71 Fed. (2d) 987; Salvage v. Commissioner, 76 Fed. (2d) 112; affd., 297 U.S. 106; and Beals' Estate v. Commissioner, 82 Fed. (2d) 268, affirming 31 B.T.A. 966. Also cf. Donal A. Carty, 38 T.C. 46, 59 (1962), *104 and the cases cited therein. In MacDonald we further held that there was no marketable asset embodying the goodwill of the corporation which could be sold to a third party. As in the instant case, we recognized the possibility that a purchaser might take over the customer list of the corporation on a contingency basis such as the "gonna" type arrangement described above. In holding that this type of an arrangement has no fair market value, we cited (p. 729) the following statement from Cassatt v. Commissioner, 137 F. 2d 745 (C.A. 3, 1943) at 729, which also applies to the instant situation: It is true that good will may be the subject of exchange. Here, however, Cassatt and Company [the seller] did not undertake to transfer its good will to Pierce [the purchaser] in exchange for property of an ascertainable market value. On the contrary the transfer was made in consideration of Pierce's promise to share with Cassatt and Company for six years in the future any commissions which it might earn during that period from business with Cassatt customers. The receipt of such commissions was wholly contingent upon Pierce's remaining in business and obtaining business from *105 the former Cassatt customers, neither of which it was under any obligation to do. It is settled that such a promise to make payments in the future "wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty" has no ascertainable fair market value. Burnet v. Logan, 283 U.S. 404, 413, 51 S. Ct. 550, 552, 75 L. Ed. 1143. We agree with Judge Learned Hand's statement in Bedell v. Commissioner of Internal Revenue, 30 F. (2d) 622, 624, (C.C.A. 2, 1929) that "It is absurd to speak of a promise to pay a sum in the future as having a 'Market value,' fair or unfair. Such rights are sold, if at all, only by seeking out a purchaser and higgling with him on the basis of the particular transaction. Even if we could treat the case as an exchange of property, the profit would be realized only when the promise was performed." In the instant case, for the same reasons as given in MacDonald, we hold that at the time of petitioner corporation's liquidation it had no goodwill, either in terms of a customer list or in any other form, which could be distributed to the individual petitioners or sold to a third party. Respondent points *106 out that the MacDonald case did not discuss whether the 1082 corporation could claim a loss from the worthlessness of a purchased intangible, as does the corporation in the instant case. However, we have found that, at the time it liquidated, petitioner corporation did not have either a valuable intangible asset to distribute to its shareholders or one which had a fair market value to a third party. Under such circumstances, it is clear that the intangible asset which originally cost $20,000 no longer had any value. Its value originally lay in the personal services of Callanan, Clark and McLaughlin for the period of their association with petitioner. At the time of its liquidation this period had terminated. Section 165 provides that a corporation may deduct losses incurred during a taxable year which are not compensated for by insurance or otherwise. [4]Rev. Rul. 57-503, 1957-2 C.B. 139, specifically provides that where a corporation's goodwill becomes worthless due to the abandonment of its business and its attendant assets, including goodwill, its basis in goodwill is deductible as an ordinary loss. In the instant case there is possibly an even stronger situation *107 than that envisaged by the regulation, as the goodwill embodied by Callanan-Clark, and McLaughlin abandoned the corporation. We hold that under these circumstances petitioner corporation had suffered a $20,000 loss of intangible goodwill. We further hold that it correctly deducted its $20,000 cost on its final return in accordance with section 165(a) of the Code, section 1.165-2, Income Tax Regs., and Rev. Rul. 57-503, supra. Our decision eliminates any deficiency in petitioner corporation's return for the fiscal year ending August 6, 1962. Consequently, there is no transferee liability on the part of either James Callanan or Frank Longo. Decisions will be entered for the petitioners. Footnotes
1. Cases of the following petitioners are consolidated herewith: James F. Callanan, Transferee, docket No. 340-66, and Callanan-Clark & Longo, Inc., docket No. 341-66.↩
2. Respondent determined a deficiency of $5,916.96, noting an overassessment of $52.78 to arrive at the net amount shown.↩
3. We note that petitioner corporation had already obtained this intangible asset, and with a tax basis of $20,000 at the time of its incorporation. This is so because Longo had paid $20,000 to Callanan for the asset and it thus had a basis of $20,000 in his hands. When he transferred all of his agency's assets to petitioner corporation, this intangible was included, and since he transferred his assets to the corporation in exchange for its stock, and immediately thereafter he and Callanan were in control of the corporation, the corporation took over his basis under sections 351 and 358 of the Code.↩
4. SEC. 165 LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.↩